State of Wisconsin, Plaintiff-Appellant,

v.

Beaver Dam Area Development Corporation, Eric Becker, Jeff Kitchen, Al Schwab, Les Frinak, Jr., John Landdeck, Doug Mathison, Tom Olson, Greg Steil, Ron Thompson, Steven Baldwin, Nancy Zieman, Gina Staskal, Brian Busler, and Jack Hankes, Defendants-Respondents,

Myrtle Clifton, Laine Meyer, Duane Foulkes, and Philip Fritsche, Defendants.

Supreme Court

*No. 2006AP662. Oral argument November 6, 2007. —Decided July 11, 2008.*

2008 WI 90

(Also reported in 752 N.W.2d 295.)

For the plaintiff-appellant the cause was argued by *Monica Burkert-Brist,* assistant attorney general, with whom on the briefs was *J.B. Van Hollen,* attorney general.

For the defendants-respondents there was a brief by *Michael J. Cieslewicz, Patti J. Kurth,* and *Kasdorf, Lewis & Swietlik, S.C.,* Milwaukee, and oral argument was by *Michael J. Cieslewicz.*

An amicus curiae brief was filed by *Edward R. Garvey, Christa Westerberg,* and *Garvey McNeil & McGillivray, S.C.,* Madison, on behalf of the Citizens for Open Government and Jack Domann, the Wisconsin Newspaper Association, the Wisconsin Broadcasters

Association, and the Wisconsin Freedom of Information Council.

An amicus curiae brief was filed by *Eric M. McLeod, Paul D. Barbato,* and *Michael Best & Friedrich LLP,* Madison, on behalf of the Wisconsin Economic Development Association, the Wisconsin REALTORS® Association, the National Association of Industrial and Office Properties, the Wisconsin Chapter, and the Wisconsin Manufacturers and Commerce.

¶ 1. ANN WALSH BRADLEY, J. Preserving an open government and promoting economic development represent two defining principles which we value as a people and strive to accomplish as a state. This case represents the intersection of these two principles.

¶ 2. The legislature has declared that we are dedicated to preserving an open and transparent government. "[I]t is declared to be the policy of this state that the public is entitled to the fullest and most complete information regarding the affairs of government as is compatible with the conduct of governmental business."[1] Additionally, the legislature has declared that we are committed to promoting economic development. We must "foster the growth and diversification of the economy of the state"[2] so that Wisconsin is "an attractive place to live and work . . . ."[3]

---

[1] Wis. Stat. § 19.81(1)(2005–06). *See also* Wis. Stat. § 19.31 (declaring open government purpose of public records laws).

All references to the Wisconsin Statutes are to the 2005–06 version unless otherwise noted.

[2] Wis. Stat. § 560.01(1)(purposes of establishment of Department of Commerce).

[3] Wis. Stat. § 560.08(1)(providing for economic and community development planning and research programs).

¶ 3. We are presented with the question of whether the Beaver Dam Area Development Corporation (BDADC) is a "quasi-governmental corporation" which is subject to Wisconsin's open meetings and public records laws. In addressing the question, we must interpret provisions of the state's open meetings and public records statutes and apply those provisions so that the legislative directives can be fulfilled and the two principles may best coexist.

¶ 4. On one hand we cannot countenance a government body circumventing the legislative directive for an open and transparent government by paying an entity to perform a governmental function. On the other hand, we have to be cognizant of the realities of economic development and the need, at times, for flexibility and confidentiality.

¶ 5. This opinion should not be read as disfavoring the desire to engage in economic development without being subject to open meetings and public records law. Indeed many private entities operate throughout this state without being subject to those laws and successfully promote economic development to the benefit of us all.

¶ 6. Likewise, there are many governmental economic development corporations that have for years operated successfully while being subject to the open meetings and public records laws. We take no position as to what is the best structure for the enhancement of economic development in a particular area.

¶ 7. Rather, this opinion should be read as setting forth the circumstances when an entity so resembles a governmental corporation, that it is treated as a quasi-governmental corporation for purposes of open meet-

90

ings and public records laws. If an entity does not want to be subject to the open meetings and public records laws, then it should change the circumstances under which it operates.

██

¶ 8. Each case has to be decided on the particular facts presented. We must examine the totality of circumstances. There is no one factor which is outcome determinative. Today we set forth some of the factors to be examined in determining what constitutes a "quasi-governmental corporation" subject to open meetings and public records laws.

██

¶ 9. We determine that an entity is a quasi-governmental corporation within the meaning of Wis. Stat. §§ 19.82(1) and 19.32(1) if, based on the totality of circumstances, it resembles a governmental corporation in function, effect, or status. Such a determination requires a case-by-case analysis. Considering the facts of this case we conclude that BDADC is a quasi-governmental corporation subject to open meetings and public records laws.

¶ 10. A primary consideration in reaching our conclusion is that BDADC is funded exclusively by public tax dollars or interest on those tax dollars. Additionally, we consider that at the time the complaint was filed, its office was located in the City of Beaver Dam ("City") municipal building and it was listed on the City website, with a web address of http://www.cityof beaverdam.com/EconomicDept/index.cfm. The City provided BDADC with clerical support and all of its office supplies, including paper, pencils, and postage.

¶ 11. Under the terms of an agreement, all of BDADC's assets revert to the City if it ceased to exist. It

is obligated to open its books for City inspection and it has to submit its annual management plan to the City. The mayor and another City official serve on its board of directors. BDADC has no clients other than the City. Its exclusive function is to promote economic development in and around the City, a function that prior to its creation had been performed by the City.

¶ 12. We apply our determination prospectively such that the defendants in the present case are not subject to forfeitures for past violations of the open meetings laws[4] and we decline to void any actions taken at past meetings not open to the public. Accordingly, we reverse the circuit court and remand to the circuit court to address the remaining request for attorney fees and costs and to enter judgment consistent with this opinion.

I

¶ 13. This case is before the court on certification from the court of appeals pursuant to Wis. Stat. § 809.61 (2005–06). The plaintiff, State of Wisconsin, asserts that the circuit court erred in dismissing the State's complaint.[5] The State seeks declaratory judgment that the Beaver Dam Area Development Corporation (BDADC) is a "quasi-governmental corporation" subject to Wisconsin's open meetings and public records laws. The complaint also seeks forfeitures against

---

[4] Upon a motion by the State, the claims against the individual defendants were dismissed without prejudice. Because the dismissal was without prejudice, the claims may be reasserted. Therefore we reference the forfeiture claim in our prospective application.

[5] The State appeals an order of the circuit court for Dodge County, Judge Richard O. Wright presiding.

BDADC and individual defendants for violations of open meetings laws, and requests that we void action taken at past BDADC meetings and award attorney fees and costs. The case involves no specific requests for records.

¶ 14. The background facts of this case are not in dispute. The circuit court set forth most of these facts in its Findings of Fact, Conclusions of Law and Order for Judgment. We reference additional facts as necessary.

¶ 15. BDADC is a nonprofit corporation organized under Wisconsin law in January 1997. It was not created by any constitution, statute, or ordinance, and the City did not through any of its officers incorporate BDADC. The bylaws of BDADC state that its exclusive purpose is to engage in economic development and business retention within the corporate limits and lands that could become part of the corporate limits of the City.

¶ 16. The officers of BDADC are private individuals who are elected by the BDADC board of directors. Under BDADC bylaws, the president of the City's chamber of commerce is a non-voting member of the board of directors. The mayor of the City and chairperson of the City Community Development Committee serve on the BDADC board by virtue of their positions as City officials and not in their capacity as private citizens. The other ten members of the board of directors are private citizens.

¶ 17. When a director's term at BDADC ends, the board of directors elects a replacement. The City does not direct this process, except insofar as the mayor and chair of the City Community Development Committee serve as ex officio members of the board of directors.

¶ 18. Up to the time this litigation commenced, BDADC has had only one paid employee, the executive

vice president, who is appointed by the BDADC board of directors. Trent Campbell served in this position from April 1997 to January 2005. Prior to BDADC's incorporation, the City had an economic development office, which Campbell directed. He left his job as director of the economic development office and became executive vice president of BDADC.

¶ 19. Until May 2005, BDADC's offices were in the City's municipal building, though it conducted no meetings in City facilities. From the time of BDADC's inception until the start of this litigation, the City included BDADC on the City's website at the web address of http://www.cityofbeaverdam.com/Economic Dept/index.cfm.

¶ 20. BDADC and the City entered into cooperation agreements in April 1997 and January 2004. The City agreed that it will provide BDADC with office space, clerical support, copy and fax machine use, telephone use, and postage. The agreements provided that City representatives may examine BDADC's accounting records and finances, and that the City may make funds available to BDADC for economic development.

¶ 21. Under the first cooperation agreement, the City agreed to pay BDADC an annual contribution and to allocate a large percentage of the proceeds from its room tax to BDADC. Under the second cooperation agreement, the City agreed to pay BDADC 90 percent of the City's room tax proceeds and no annual contribution. BDADC's income for the relevant time period consisted entirely of the room tax money or interest on the room tax money. In the first half of 2005, for example, the room tax contribution accounted for about 84 percent of BDADC's income. The rest of its income was from interest.

¶ 22. The 2004 agreement provides that BDADC must submit its annual management plan to the City. The 2005 plan allows that BDADC may negotiate financial incentives for businesses and work on dealing with infrastructure and government approval issues related to attracting business to the area.

¶ 23. Under BDADC's articles of incorporation, upon BDADC's dissolution or liquidation, any remaining assets shall be distributed to the City and used for economic development and business retention. BDADC cannot bind the City to contracts, and recommendations by BDADC are considered and acted upon by the City under the requirements of state open meetings and public records law. The City has been BDADC's sole client for the time relevant to the case, and BDADC does not have other ongoing business relationships with other clients.

¶ 24. In 2004 and 2005, BDADC negotiated on the City's behalf regarding potential developments by a variety of businesses. BDADC entered into a memorandum of understanding with the Wal-mart corporation regarding developing a distribution center in the area. The topics of discussion included utilities and fire protection, and the memorandum provided that the City would make site improvements. While the mayor is the signatory of the agreement, BDADC was the negotiator.

¶ 25. In late 2004, the State filed a complaint seeking declaratory judgment that BDADC is a quasi-governmental corporation and subject to the State's open meetings laws and public records laws, and alleging that BDADC convened on various occasions in violation of the open meetings laws. It further alleged violations of open meetings laws by several individuals.

¶ 26. The circuit court determined that the BDADC is not a quasi-governmental corporation and entered judgment in favor of BDADC, dismissing the State's complaint. The State appealed and the court of appeals requested certification.

## II

¶ 27. This is a case of first impression. The central issue in this case is whether BDADC is a quasi-governmental corporation within the meaning of Wisconsin's open meetings and public records statutes.

¶ 28. Determining whether BDADC is a quasi-governmental corporation requires that we interpret provisions of the state's open meetings and public records statutes and apply our interpretation to undisputed facts. Statutory interpretation presents questions of law that we review independently of the determinations rendered by the circuit court. *State ex rel. Buswell v. Tomah Area School District,* 2007 WI 71, ¶ 10, 301 Wis. 2d 178, 732 N.W.2d 804.

## III

¶ 29. In determining whether BDADC is a quasi-governmental corporation, we examine first the language of the statutes. Wisconsin's open meetings laws apply to governmental bodies,[6] defined as follows:

(1) "Governmental body" means a state or local agency, board, commission, committee, council, department or public body corporate and politic created by constitution, statute, ordinance, rule or order; *a governmental*

---

[6] Wis. Stat. § 19.83.

*or quasi-governmental corporation* except for the Bradley center sports and entertainment corporation; a local exposition district under subch. II of ch. 229; a family care district under s. 46.2895; a nonprofit corporation operating the Olympic ice training center under s. 42.11 (3); or a formally constituted subunit of any of the foregoing . . . .

Wis. Stat. § 19.82(1) (emphasis added).

¶ 30. The state public records laws apply to authorities.[7] Wisconsin Stat. § 19.32(1) defines "authority" to include quasi-governmental corporations:

As used in ss. 19.33 to 19.39:

(1) "Authority" means any of the following having custody of a record: a state or local office, elected official, agency, board, commission, committee, council, department or public body corporate and politic created by constitution, law, ordinance, rule or order; *a governmental or quasi-governmental corporation* except for the Bradley center sports and entertainment corporation . . . .

(Emphasis added.)

¶ 31. "Quasi-governmental corporation" is defined in neither the statutes nor the case law interpreting the statutes. However, focusing strictly on the words chosen by the legislature, it is clear that "quasi-governmental corporation" means something other than a governmental corporation. Interpreting quasi-governmental corporation to include only governmental entities would render the term superfluous, contrary to the basic principle that we interpret statutes so as to avoid rendering language superfluous. *State v. Harenda Enterprises, Inc.*, 2008 WI 16, ¶ 54, 307 Wis. 2d 604, 746 N.W.2d 25;

---

[7] Wis. Stat. §§ 19.33–19.39.

*Hutson v. State Pers. Comm'n,* 2003 WI 97, ¶ 49, 263 Wis. 2d 612, 665 N.W.2d 212.

¶ 32. Examining the vernacular understanding of "quasi" aids our analysis: "Having a likeness to something; resembling." *American Heritage Dictionary of the English Language,* 1482 (3rd ed. 1992). Employing such understanding here, a quasi-governmental corporation would refer to an entity that has a likeness to or resembles a governmental corporation, but which is not a governmental corporation.

¶ 33. The history of the open meetings and public records statutes provides further guidance. The term "quasi-governmental corporation" was introduced into Wisconsin's open meetings law in 1976, when Wis. Stat. § 66.77 (1973–74) was repealed and replaced by §§ 19.81–19.98.[8] Section 66.77 provided that open meetings laws applied to a "governmental body" and included "municipal or quasi-municipal corporation[s]" within the definition of governmental body. Wis. Stat. § 66.77(2)(c)(1973–74). When the statute was replaced, the legislature discarded "municipal or quasi-municipal corporation" in favor of "governmental or quasi-governmental corporation." Chapter 476, Law of Wisconsin 1975.

¶ 34. By changing the language, the legislature expanded the reach of the open meetings law. The import of this expansion is described by a leading treatise on municipal law. It explains that quasi-municipal corporations are those corporations that resemble a municipal corporation in some respect and which are public:

---

[8] The public records provisions at issue here, Wis. Stat. §§ 19.31–19.39, were added as of January 1, 1983. Chapter 335, Laws of 1981.

["Quasi-municipal corporation"] denotes a corporation created or authorized by the legislature that is merely a public agency endowed with such of the attributes of a municipality as may be necessary in the performance of its limited objective. In other words, a quasi-municipal corporation is a public agency created or authorized by the legislature to aid the state . . . .

"Quasi-municipal" corporations are public in nature, but not, strictly speaking, municipal corporations.

Eugene McQuillen, *Municipal Corporations* § 2.13 (3rd ed. Rev. 1987 & Supp. 1990).

¶ 35. In contrast, the treatise explains that "quasi-public corporation" refers to an entity that "is not per se public or governmental. . . . But 'quasi' indicates that the private corporation has some resemblance to a public corporation in function, effect or status." *Id.* Likewise, a quasi-governmental corporation is one that is not per se governmental, but resembles a governmental corporation in function, effect, or status.

¶ 36. Thus, prior to the creation of §§ 19.82–19.98, Wisconsin's open meetings law applied only to entities that were, strictly speaking, public. However, by changing the language of the open meetings statutes, the legislature expanded the law to apply to entities that are not per se public.

■■

¶ 37. As noted, neither this court nor the court of appeals has interpreted "quasi-governmental corporation" within the meaning of §§ 19.82(1) and 19.32(1). However, the state attorney general has written several opinions on the issue.[9] Opinions of the attorney general

---

[9] *See* 73 Op. Att'y Gen. 53 (1984)(concluding that a historical sites organization was not a quasi-governmental corporation because it did not possess any governmental attributes and

are not binding as precedent, but they may be persuasive as to the meaning of statutes. *State v. Wachsmuth,* 73 Wis. 2d 318, 323, 243 N.W.2d 410 (1976). The legislature has expressly charged the state attorney general with interpreting the open meetings and public records statutes, and provided that "[a]ny person may request advice from the attorney general as to the applicability" of the laws. Wis. Stat. §§ 19.98 and 19.39. Thus the interpretation advanced by the attorney general is of particular importance here.

¶ 38. The most extensive analysis of the issue is found in a 1991 opinion regarding whether the Milwaukee Economic Development Corporation ("Development Corporation") and the Metropolitan Milwaukee Enterprise Corporation ("Enterprise Corporation") were quasi-governmental corporations within the meaning of § 19.82(1) of the open meetings statutes. 80 Op. Att'y Gen. 129 (1991). The Development Corporation articles of incorporation stated that its purpose was to "further the economic development" and "to promote job creation" in the Milwaukee area. Under the Development Corporation's bylaws, four of its nine directors were filled by specified city officials and four of its six officers "may be selected by the city."

¶ 39. The Enterprise Corporation provided economic development loans with money received from the city via federal small business loans. Its articles of

therefore did not resemble a governmental organization); 66 Op. Att'y Gen. 113 (1977)(advising that a volunteer fire department was not a quasi-governmental corporation because it was not directly created by a governmental body); 74 Op. Att'y Gen. 38 (1985)(determining that "friends" groups supporting public television and radio stations were not quasi-governmental corporations because they were not directly created by government entities).

incorporation provided for fourteen directors, none of which were reserved for city officials or personnel. Two directors, however, were members of the city council and one was a city employee.

¶ 40. Both the Development Corporation and the Enterprise Corporation listed the Department of City Development as their principal address, located all of their offices in city-owned buildings, and received from the city office space, equipment, and supplies. As with the Development Corporation, the Enterprise Corporation's bylaws allow that the city could select four officers pursuant to a contract between it and the city.

¶ 41. In analyzing whether the two entities were quasi-governmental corporations, the attorney general opined that a quasi-governmental corporation must resemble a governmental corporation. It found support for its view in the treatise cited above, explaining that a " 'quasi-public [or quasi-governmental] corporation' is not per se public or governmental . . . . [and] has some resemblance to a public corporation in function, effect or status." 80 Op. Att'y Gen. at 135 (quoting McQuillian, § 2.13 (3rd ed. Rev. 1987 & Supp. 1990)(brackets in 80 Op. Att'y Gen. 129)). The attorney general explained that determining whether an entity closely enough resembles a public corporation to be considered quasi-governmental requires a case-by-case analysis made in light of the totality of circumstances. 80 Op. Att'y Gen. at 136.

¶ 42. Applying such an analysis, the attorney general considered the facts that both corporations served the public purpose of promoting economic development, received most of their funding from public sources, used the city's development department as their principal places of business, were housed in city-owned buildings, and used city equipment and supplies. In addition, it

reasoned that the corporations were subject to control by the city insofar as four of the Development Corporation's nine directors served by virtue of being city officials, and the city selected four officers in both of the corporations.

¶ 43. In light of these facts, the attorney general determined that the corporations were quasi-governmental corporations because they resembled a governmental corporation. Thus, it concluded that they were subject to state open meetings laws.

¶ 44. Based upon the statutory language, principles of statutory construction, the history of Wisconsin's open meetings and public records laws, and the interpretations of the Attorney General, we determine that quasi-governmental corporations are not limited to corporations created by acts of the government. Rather, a quasi-governmental corporation is a corporation that resembles a governmental corporation.

¶ 45. However, merely superficial resemblance to governmental corporations in a single respect is insufficient for an entity to be subject to open meetings and public records laws. Rather, a determination that an entity resembles a governmental corporation such that it is subject to state open meetings and public records laws requires an examination of the totality of facts about the entity. Thus, determining whether any particular entity resembles a governmental corporation must be done on a case-by-case basis.[10]

[10] This approach also comports with the approach taken in several other jurisdictions. *See* Craig D. Feiser, *Protecting the Public's Right to Know: The Debate Over Privatization and Access to Government Information Under State Law*, 27 Fla. St. L. Rev. 825, 837–44 (2000)(collecting cases from jurisdictions

## IV

¶ 46. Although the parties essentially agree that analyzing the totality of circumstances is a proper approach, they disagree on the application of the approach to the present case.[11] BDADC contends that under the totality of the circumstances approach set forth in 80 Op. Att'y Gen. 129 it does not resemble a governmental corporation. It concedes that, like the Milwaukee Economic Development Corporation and the Metropolitan Milwaukee Enterprise Corporation, BDADC receives the vast majority of its funding from public sources. However, it maintains that public funding is the only way in which BDADC is similar to the corporations in 80 Att'y Gen. 129.

¶ 47. It notes that, unlike the Development Corporation and the Enterprise Corporation, all of BDADC's officers are private individuals, and that most of its directors are private citizens. Further, BDADC's only full-time employee is appointed by the board and is not an employee of the City. It also points to the fact

---

employing a "totality of factors" approach to determining applicability of public records laws to private entities).

[11] Although the parties agree that analyzing the totality of circumstances is a proper approach, the dissent objects to the approach on the ground that it fosters uncertainty. Dissent, ¶ 146. We apply totality of circumstances tests, along with the attendant uncertainty, in cases involving our most basic rights. *See State v. Young*, 2006 WI 98, ¶ 75, 294 Wis. 2d 1, 717 N.W.2d 729 (Fourth Amendment); *State v. Thiel*, 2003 WI 111, ¶ 62, 264 Wis. 2d 571, 665 N.W.2d 305 (Sixth Amendment right to counsel); *State v. Lindell*, 2001 WI 108, ¶ 41, 245 Wis. 2d 689, 629 N.W.2d 223 (right to an unbiased jury); *State v. Secrist*, 224 Wis. 2d 201, 218, 589 N.W.2d 387 (1999) (right that arrest be made only with probable cause). Applying a totality of circumstances test in this context is no more problematic than doing so in cases involving such basic rights.

that although the BDADC had offices in the City municipal building, and although the City was obligated to provide office space under the cooperation agreement, its meetings were not held at municipal facilities.

¶ 48. Finally, BDADC argues that unlike the Development Corporation and Enterprise Corporation, its relationship with the City was cooperative, and not controlled by the City. For example, both cooperation agreements between the City and BDADC state that BDADC is not a governmental body. Further, BDADC cannot bind the City or enter into a contract on behalf of the City.

¶ 49. The question before us, however, is not whether BDADC resembles the corporations in 80 Att'y Gen. 129. Rather, it is whether BDADC resembles a governmental corporation based on the totality of the circumstances. In answering that question, we draw on several sources in addition to the attorney general opinion discussed above.

¶ 50. Although the determination of whether an entity is subject to open meetings and public records laws depends on the respective statutory language of each state, the interpretations rendered by courts in other jurisdictions are instructive. We initially examine the determinations rendered by the highest state court in three jurisdictions, Maryland, New York, and Florida.[12]

---

[12] The dissent complains about our use of cases from other states interpreting different statutory language. It appears to believe that we are using these cases to determine the meaning of "quasi-governmental corporation," and calls our discussion of other cases a "leap of logic" and "results-oriented." Dissent, ¶ 159. The dissent misinterprets our approach. We have determined the meaning of quasi-governmental corporation based

¶ 51. The Court of Appeals of Maryland recently addressed whether state open meetings and public records laws applied to an economic development corporation in *City of Baltimore Dev. Corp. v. Carmel Realty Assocs.*, 910 A.2d 406 (Md. 2006). The development corporation held meetings and voted to recommend for final approval by the mayor a primary developer for a large city project. The realtors filed suit, alleging that the development corporation was a public body subject to open meetings laws and an instrumentality of the City of Baltimore subject to public records laws. *Id.* at 415.

¶ 52. In considering the nature of public bodies, the court divided the development corporation's functions into three categories: purely public functions, mixed public and private functions, and purely private functions. It considered purely public the corporation's purposes of working toward city development strategies; activities to achieve strong business climate and urban renewal; implementing, overseeing, and encouraging private and public development projects; attracting new businesses; and carrying out contracts with the city to coordinate planning. *Id.* at 424. Further, the court noted that the development corporation was purely public insofar as the mayor had the power to appoint, nominate, and remove members of the corporation, 80 percent of its budget was provided by the city, and its property would revert to the city if the corporation ceased to exist. *Id.*

upon the language of the statute, its history, and the interpretations rendered by the attorney general. Whether a particular entity resembles a governmental corporation requires an analysis of the traits of governmental corporations. We use the cases from other jurisdictions to examine what characteristics are relevant in determining whether an entity resembles a governmental corporation, not to discern the meaning of "quasi-governmental corporation."

¶ 53. The court saw other of the corporation's functions as mixed public and private functions. These included coordinating development efforts between public and private sectors, providing financial assistance and advice to create a stronger business climate, enhancing the city's image, and receiving funds from public and private sources other than the city. *Id.* Significantly, the court determined that the development corporation had no functions that were purely private. *Id.*

¶ 54. In assessing the totality of the circumstances, the court determined that because the development corporation had no purely private functions, the open meetings law required that the corporation's deliberations be as open as the proceedings of the mayor and city council. *Id.* at 425. Similarly, because the corporation was established with no purely private function, the court determined that it was "an agent or tool" of the city and subject to state public records law. *Id.* at 427.

¶ 55. The approach taken in *Carmel Realty* is similar to the approach taken by the New York Court of Appeals in determining whether the Buffalo Enterprise Development Corporation was required to comply with state public records laws. *Buffalo News v. Buffalo Enter. Dev. Corp.*, 644 N.E.2d 277 (N.Y. 1994). The corporation's purposes included reducing unemployment, maintaining and creating job opportunities, encouraging development, and lessening government burdens, which the court determined were "undeniably governmental." *Id.* at 278–79.

¶ 56. The funding for Buffalo Enterprise derived entirely from public sources. *Id.* at 278. Two city officials served as permanent directors of Buffalo Enterprise, and at the time of the action another city official served as an appointed member of its board. Other members were not city officials. Further, it described itself in financial

statements and public brochures as an "agent" of the city, and it was required to disclose its annual budget. *Id.* at 279. Based on these factors, the court concluded that Buffalo Enterprise was subject to the public records laws.

¶ 57. In *News and Sun-Sentinel Co. v. Schwab, Twitty, & Hanser Arch. Group,* 596 So. 2d 1029 (Fla. 1992), the Florida Supreme Court determined that the records of an architectural firm that contracted with a school board to provide services on a construction project were not subject to state public records law. In making its determination, the court examined a variety of factors. Among the factors examined were the level of public funding, whether the entity performed a governmental function, whether services contracted for are an integral part of a public agency's decision-making process, and the extent of a public agency's control over the entity. *Id.* at 1031.

¶ 58. The court determined that the firm did not function as part of a public body's decision process. Rather, the services provided by the firm "were not an integral part of the school board's decision-making process. . . . There was no delegation of or participation in any aspect of the school board's decision-making process." *Id.* at 1032. Further, the court determined that the firm's funding indicated that it was not subject to public records laws. The firm was paid by public funds, but it did not receive the money in order to put the money to a public use. Instead, "the firm's motivation for rendering professional services . . . was clearly to receive compensation, not to provide a public service." *Id.* at 1032–33.

¶ 59. Although this court and the court of appeals have not interpreted "quasi-governmental corporation" within the meaning of open meetings and public

records laws, we recently examined whether the University of Wisconsin Hospital & Clinics Authority ("Authority") was a "political corporation" under Wis. Stat. §§ 893.80(1)(a) and (1m). *Rouse v. Theda Clark Medical Center, Inc.*, 2007 WI 87, ¶ 17, 302 Wis. 2d 358, 735 N.W.2d 30. We determined that "[g]iven the power and structure" of the Authority, it is a political corporation, *Id.*, ¶ 31, which is "synonymous with the term 'public corporation.' " *Id.*, ¶ 22 (citing *Black's Law Dictionary* 344 (7th ed. 1999)).

¶ 60. In reaching that conclusion, we considered a variety of factors, including the creation of the Authority by the legislature and the fact that its directors were public officials or appointed by public officials. We noted that the Authority had duties to engage in collective bargaining and to enter into agreements and leases with the state. *Id.* ¶ 31.

¶ 61. The court paid particular attention to the Authority's financial and reporting requirements. We explained that failure to extend or renew agreements or leases would result in the transfer of facilities to the board of regents. Further, we noted that the "state is ensured of access to the [Authority's] financial statements" and that the Authority "must update the state on a consistent basis." *Id.* The court made the determination that the Authority is a political corporation despite the Authority's dissimilarities with public entities, including the fact that the Authority does "not receive general purpose revenue from the state." *Id.*, ¶ 32. While *Rouse* does not directly address whether an entity is a quasi-governmental corporation, it is instructive here insofar as it sets forth factors relevant in classifying an entity with characteristics of both public and private corporations. *Id.*, ¶ 22.

¶ 62. From these cases we can discern a number of factors that are important in determining whether an entity is subject to open meetings and public records laws. First among these is finances. In determining whether entities are subject to freedom of information laws a "key factor in bringing such bodies within the coverage of a state [freedom of information] law nearly always is state funding of the entity." Burt A. Braverman and Wesley R. Heppler, *A Practical Review of State Open Records Laws,* 49 Geo. Wash. L. Rev. 720, 731 (1981). This view is echoed is many jurisdictions.[13] Additional factors include whether it serves a public function,

---

[13] The Nebraska Supreme Court has determined that the power to receive tax revenue suffices to render an agricultural society, formed by voluntary association pursuant to a statute, a "public body" subject to state open meetings law. *Nixon v. Madison County Agricultural Society,* 348 N.W.2d 119, 119–20 (Neb. 1984).

Other courts have determined that funding is an important, though not dispositive, factor in whether an entity is subject to open meetings and public records laws. In *State ex rel. Toledo Blade Co. v. University of Toledo Foundation,* 602 N.E.2d 1159 (Ohio 1992), the Ohio Supreme Court determined that a private nonprofit foundation that received and solicited gifts on behalf of a public university was subject to open meetings and public records laws. The court based its decision on the fact that the foundation received tax revenues, had free office space from the university, had its employees' wages paid by university funds, and performed a public function. *Id.* at 1162–63. *See also Weston v. Carolina Research & Dev. Found.,* 401 S.E.2d 161 (S.C. 1991)(foundation operated for benefit of public university which receives and expends public funds subject to open records law); *Massachusetts Bay Transp. Auth. Ret. Bd. v. State Ethics Comm'n,* 608 N.E.2d 1052, 1056 (Mass. 1993); *Adams County Record v. Greater North Dakota Ass'n,* 529 N.W.2d 830, 834–38 (N.D. 1995).

whether it appears to the public to be a government entity, whether the entity is subject to government control, and the degree of access that government bodies have to the entity's records.

¶ 63. As we conclude above, an entity is a quasi-governmental corporation if, based on the totality of the circumstances, it resembles a governmental corporation in function, effect, or status. In light of the foregoing authorities, and based on the factors set forth, we conclude that BDADC does resemble a governmental corporation.[14]

¶ 64. To begin, we emphasize the fact that BDADC is almost entirely taxpayer funded. While BDADC minimizes the importance of its source of

---

[14] The factors set forth here are not exclusive in determining whether entities are subject to open meetings and public records laws. Rather, they are the factors relevant to the present case. In *News and Sun-Sentinel Co. v. Schwab, Twitty, & Hanser Arch. Group,* 596 So.2d 1029 (Fla. 1992), for example, the Florida Supreme Court established a nine-factor test for determining whether a private corporation acted on the behalf of a public agency. Among those nine factors were the level of public funding, whether public and private funds were commingled, whether a public agency had a substantial financial interest in the entity, for whose benefit the private entity was acting, and whether the private entity's services were an integral part of the public agency's decision-making process. *Id.* at 1031. The Colorado Court of Appeals adopted the same nine-factor test in *Denver Post Corp. v. Stapleton Dev. Corp.,* 19 P.3d 36, 41 (Colo. Ct. App. 2000).

A leading treatise on open meetings laws sets forth 14 factors used by courts in determining whether private entities are subject to such laws. Ann Taylor Schwing, *Open Meetings Laws* (2d ed. 2000), § 4.100. Among the factors included are whether the entity is exempt from taxes, whether it is a for-profit or nonprofit entity, whether it is subject to government audits, and whether it is entitled to assert governmental immunities. *Id.*

funding, it is a significant factor.[15] Under both the 1997 and 2004 cooperative agreements the City gave substantial funding to BDADC. The first agreement stated that the City would include an annual contribution to BDADC in its budget. It further provided that the City would allocate a large portion of its room tax to BDADC. The 2004 agreement stated that the City would allocate to BDADC 90 percent of the proceeds of its room tax, with no annual contribution written into its budget. BDADC's income consists entirely of the room tax money and interest on the room tax money. In the first half of 2005, for example, the proceeds from the room tax constituted about 84 percent of BDADC's income and the rest was interest income. Further, the City provided BDADC with office space, supplies, and clerical support.

---

[15] The dissent similarly minimizes the importance of BDADC's funding by claiming that the persons upon whom the room tax is levied do not actually pay the tax. Dissent, ¶ 115 n.3. Its view directly contradicts the language of the ordinance, which states that the "tax is imposed upon the retailers" furnishing lodging. City of Beaver Dam, Wisconsin Municipal Code § 2–124(b). In addition, the dissent's claim that "transients, not residents, pay the room tax," *id.,* makes an assumption about who foots the bill for lodging in Beaver Dam. The dissent has provided no information regarding whether such bills are paid by Beaver Dam businesses and residents for their guests, by people who live elsewhere, or by someone else altogether. It appears to have simply made up facts.

More important, though, is the dissent's implication that the residents of Beaver Dam are not entitled to information about how their government spends its money based upon the source of the money. The dissent's view is unsupported, novel, and wrong. Regardless of who pays the tax money, it is for the use of the residents of Beaver Dam, and their claim to know how it is used is undiminished.

¶ 65. Like a governmental corporation, BDADC receives the vast majority of its funds from taxes borne by the public and receives basic support from government sources. In this respect, BDADC more closely resembles a governmental corporation in status than the corporation we examined in *Rouse.* There, we determined that the University of Wisconsin Hospital & Clinics Authority was a political corporation despite it receiving no "general purpose revenue from the state." 302 Wis. 2d 358, ¶ 32.

¶ 66. With respect to finances, BDADC is akin to the development corporation subject to open meetings and public records laws in *Carmel Realty,* and akin to the development corporation considered in *Buffalo News.* It is also similar to the corporations that the attorney general examined in 80 Op. Att'y Gen. 129. Moreover, unlike the architecture firm in *News and Sun-Sentinel,* 596 So. 2d 1029, BDADC received tax money in order to provide public service, not merely to receive compensation. Thus, BDADC resembles a governmental corporation insofar as it is a tax-funded organization which receives funds to achieve a public purpose.

¶ 67. The degree to which BDADC's funding comes from the City is not the only way in which its finances are like the finances of a governmental corporation. Under its articles of incorporation, if BDADC is dissolved or liquidated, any of its remaining assets are to be distributed to the City. In effect, the City provides assets for the BDADC to use, but retains an interest in those assets.

¶ 68. This parallels the Maryland Court of Appeals' reasoning in *Carmel Realty,* which considered the fact that a development corporation's assets would revert to a city important in its determination that the

corporation was subject to state open meetings and public records laws. 910 A.2d at 415. It also parallels our reasoning in *Rouse,* where we considered significant the fact that property would transfer to the University of Wisconsin Board of Regents in the event that the Authority failed to extend or renew an agreement or lease. 302 Wis. 2d 358, ¶ 31.

¶ 69. In addition, BDADC resembles a governmental corporation with respect to the function it serves, both in terms of its purpose and its actions. BDADC's bylaws state that its exclusive purpose is to engage in economic development and business retention within the corporate limits and lands that could become part of the corporate limits of the City. Prior to BDADC's incorporation, the City had an economic development office that served that function. Moreover, BDADC has no other clients. Thus, with respect to the function it serves, BDADC is indistinguishable from the City office that preceded BDADC's incorporation. That resemblance is all the stronger insofar as the executive vice president of BDADC from 1997 until early 2005 had previously served as director of the City's economic development office.

¶ 70. While BDADC cannot bind the City or enter contracts on behalf of the City, it does resemble a governmental corporation insofar as it negotiates on behalf of the City. In its negotiations with Wal-Mart regarding the development of a building site, BDADC discussed utilities and fire protection. It also negotiated a memorandum of understanding that provided that the City would make improvements to the site. These are functions that the City would perform in BDADC's absence.

¶ 71. BDADC's functions are similar to those of the corporation in *Buffalo News*. Both BDADC and

Buffalo Enterprises work to encourage development and economic opportunity, which the New York Court of Appeals determined to be "undeniably governmental." 644 N.E.2d at 278–79.

¶ 72. The functions BDADC performs are precisely those that led the *Carmel Realty* court to determine that a development corporation was a public body and instrument of a city subject to open meetings and public records laws. 910 A.2d at 410. Also like the corporation in *Carmel Realty,* BDADC does not appear to have any purely private function. The fact that final approval for contracts must come from the City does not diminish BDADC's public function. As the *Carmel Realty* court made clear, an entity may serve a public function even if it merely makes recommendations subject to final approval by a city official. 910 A.2d at 425.

¶ 73. BDADC's status also resembles that of a governmental corporation from the perspective of the public. Until after the start of this litigation, BDADC's offices were located in the City's municipal building, and the City included BDADC on its website. Two of BDADC's directors were City officials. The effect of such close ties is to make it difficult for the public to discern where the City ends and BDADC begins.

¶ 74. In this respect BDADC is similar to the corporation in *Buffalo News,* which stated in its public brochures and financial statements that it was an agent of a city. 644 N.E.2d at 279. It is also similar to the corporations examined in 80 Op. Att'y Gen. 129, which were housed in municipal buildings and listed the Department of City Development as their principal addresses. Thus, BDADC resembles a governmental corporation in its public appearance.

¶ 75. BDADC also resembles a governmental corporation to the extent that the City maintains a degree of control over BDADC's actions. An aspect of that control is the composition of BDADC's board of directors. Although a majority of BDADC's directors are private citizens, two are City officials that serve as ex officio members. This contrasts with *Rouse,* where all of the voting members of the board of directors were either public officials or appointed by public officials. It also contrasts with *Carmel Realty.*

¶ 76. However, in *Buffalo News* only three members of the corporation's board were city officials, 644 N.E.2d at 278, and one of the corporations considered in 80 Op. Att'y Gen. 129 reserved no positions on its board for city officials. Further, having a board composed of or appointed by public officials is not a requirement for an entity to be subject to open meetings and public records laws. Rather, it is part of a totality of circumstances test. Finally, the fact that some City officials serve as ex officio members of BDADC's board evinces some degree of City control.

¶ 77. The degree of access that the City has to BDADC's information is also important in determining whether BDADC is a quasi-governmental corporation. The cooperative agreements between the City and BDADC allow that City representatives may examine BDADC's accounting records. Additionally, the 2004 agreement provides that BDADC must submit its annual management plan to the City.

¶ 78. In *Rouse,* the facts that the Authority was required to "update the state on a consistent basis" and that the state was "ensured access to the [Authority's] financial statements" were important to our determination that it was a political corporation. 302 Wis. 2d 358, ¶ 32. Similarly, in *Buffalo News,* the fact that Buffalo

Enterprises had to disclose its annual budget weighed in favor of the determination that it was subject to public records laws. 644 N.E.2d at 279. Accordingly, insofar as BDADC must provide the City with access to information, it resembles a governmental corporation.

¶ 79. Thus, BDADC resembles a governmental corporation in several important respects: (1) other than interest income, its sole source of funds is public tax dollars, (2) it serves a public function and has no purely private function, (3) it appears in its presentation to the public that it is part of the City, (4) the City maintains a degree of control over BDADC, and (5) the City has access to BDADC's financial information and management plan. No one of these ways is sufficient to conclude that BDADC is a quasi-governmental corporation. However, considering them in totality, we determine that BDADC resembles a governmental corporation in function, effect, or status. Thus, it is a quasi-governmental corporation within the meaning of §§ 19.82(1) and 19.32(1).[16]

## V

¶ 80. Having determined that BDADC is a quasi-governmental corporation does not mean that all of its

---

[16] The dissent at once complains of the lack of a bright line rule and the stringency of the test set forth in this opinion. Dissent, ¶¶ 198–99, 215. It cites to an unadopted legislative proposal to define economic development corporation as evidence of the need for a bright-line rule. *Id.*, ¶ 195. Both of the bright-line proposals cited by the dissent are *more* stringent than the test set forth here, and both would include BDADC. *Id.*, ¶¶ 196–97. Thus, contrary to the dissent's assertion, either proposal would dictate the result that BDADC is a quasi-governmental corporation. *See id.*, ¶ 197–98. Moreover, the apparent need for such proposals is evidence that a bright-line rule is not inherent in the words of the statute.

meetings are automatically open or that all of its records are immediately disclosed to the public. There are several ways in which economically important information could be protected from disclosure for the purposes of open meetings and public records laws.[17]

¶ 81. For example, § 19.85(1)(e) allows for closed sessions regarding purchases of public property, investing public funds, or doing other public business "whenever competitive or bargaining reasons require a closed session."[18] Similarly, § 19.85(1)(i) allows closed sessions for matters related to the economic adjustment program pursuant to Wis. Stat. § 560.15[19] where discussing such matters in open session "could adversely affect the business, its employees or former employees." Wis. Stat. § 19.85(1)(i). Additionally, at oral argument BDADC conceded that much of its work is done by its executive vice president, and that informal meetings between companies and the executive vice president would not constitute meetings under § 19.82(2).[20]

---

[17] *See Sands v. Whitnall School District* for discovery rules applicable to meetings in closed session pursuant to chapter 19, Wisconsin Statutes. 2008 WI 89, 312 Wis. 2d 1, 754 N.W.2d 439.

[18] Wisconsin Stat. § 19.85(1)(e) provides that a closed session may be held:

> (e) Deliberating or negotiating the purchasing of public properties, the investing of public funds, or conducting other specified public business, whenever competitive or bargaining reasons require a closed session.

[19] Wisconsin Stat. § 560.15 provides for communities to assist businesses considering ceasing operations or laying off employees in the state.

[20] Wisconsin Stat. § 19.82(2) provides in relevant part:

> "Meeting" means the convening of members of a governmental body for the purpose of exercising the responsibilities, authority, power or duties delegated to or vested in the body. If onehalf or

117

¶ 82. The public records statutes also contain provisions which may prevent disclosure of information important to economic development. Recognizing the relation between open meetings and public records laws, § 19.35(1)(a) allows that under some circumstances exemptions to open session requirements under § 19.85 can serve as a basis for denying public access to a record.

> The exemptions to the requirement of a governmental body to meet in open session under s. 19.85 are indicative of public policy, but may be used as grounds for denying public access to a record only if the authority or legal custodian under s. 19.33 makes a specific demonstration that there is a need to restrict public access at the time that the request to inspect or copy the record is made.

Wis. Stat. § 19.35(1)(a); *see Zellner v. Cedarburg Sch. Dist.*, 2007 WI 53, ¶ 49, 300 Wis. 2d 290, 731 N.W.2d 240.

¶ 83. Another important consideration is § 19.36(5), which allows that authorities "may withhold access to any record or portion of a record containing information qualifying as a trade secret" pursuant to Wis. Stat. § 134.90(1)(c). "Trade secrets" are defined as follows:

> (c) "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique or process to which all of the following apply:
>
> 1. The information derives independent economic value, actual or potential, from not being generally

---

more of the members of a governmental body are present, the meeting is rebuttably presumed to be for the purpose of exercising the responsibilities, authority, power or duties delegated to or vested in the body. . . .

known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

2. The information is the subject of efforts to maintain its secrecy that are reasonable under the circumstances.

Wis. Stat. § 134.90(1)(c).[21]

¶ 84. In addition to the express statutory provisions limiting disclosure under public records law, Wisconsin courts have recognized other limitations to disclosure, including the requirement that the harm to the public from disclosure should be balanced against the benefit of disclosure to the public. One must be balanced against the other in determining whether to permit disclosure. *State ex rel. Youmans v. Owens,* 28 Wis. 2d 672, 681, 137 N.W.2d 470 (1965); *see also* Melanie R. Swank, *The Wisconsin Public Records and Open Meetings Handbook,* 2nd ed., § 4.9.

¶ 85. Accordingly, in *Linzmeyer v. Forcey,* 2002 WI 84, 254 Wis. 2d 306, 646 N.W.2d 811, once this court

---

[21] The federal Freedom of Information Act specifically exempts "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4)(2007). Several states follow the federal statute and expressly provide exemptions for commercial and financial information other than trade secrets. *See* Theresa M. Costonis, *What Constitutes Commercial or Financial Information, Exclusive of Trade Secrets, Exempt From Disclosure Under State Freedom of Information Acts—General Rules of Construction,* 5 A.L.R. 6th 327, § 2 (2005). The Wisconsin legislature, however, has expressly exempted only trade secrets. The determination of whether information other than trade secrets should be exempt from public records disclosures in order to further the policy of economic development is a question best addressed by the legislature.

determined that the open records law applied to a report regarding potential teacher misconduct, this court examined whether a public policy interest in keeping the record confidential overcame the presumption favoring disclosure. *Id.*, ¶ 11. In so determining, it applied a balancing test "weigh[ing] the public policies not in favor of release against the strong public policy that public records should be open for review." *Id.*, ¶ 12 (citing *Woznicki v. Erickson,* 202 Wis. 2d 178, 549 N.W.2d 699 (1996), and *Newspapers, Inc. v. Breier,* 89 Wis. 2d 417, 279 N.W.2d 179 (1979)). The court determined that disclosure was favored in part because the investigation into the misconduct had been closed and no further proceedings were pending. Thus, releasing records could not be expected to interfere with ongoing proceedings. *Id.*, ¶ 39.

¶ 86. Likewise, in *Wisconsin Newspress, Inc. v. School Dist. of Sheboygan Falls,* 199 Wis. 2d 768, 546 N.W.2d 143 (1996), this court determined that an important factor in determining whether to release a letter to a school district employee regarding a disciplinary action was the fact that the disciplinary action had already taken place. *Id.* at 788. Thus, the harm that could result from premature release (creating a false impression) was no longer present. *Id.*

¶ 87. Similarly, in a case involving disclosure of information relating to economic development, the balance may tip in different directions depending on the timing of the request. Where premature disclosure of records could undermine an important public policy objective in the context of economic development, the balance may tip in favor of nondisclosure. However, when releasing the records could not be expected to interfere with ongoing negotiations, the public interest

120

in disclosure may outweigh the public interest in non-disclosure.

¶ 88. Although BDADC argues that its ability to properly function will be impaired if it is determined to be a quasi-governmental corporation, we note that other economic development corporations appear to function well despite operating as quasi-governmental organizations. As we discuss above, in 80 Op. Att'y Gen. 129 the attorney general advised two economic development corporations that they would be considered quasi-governmental corporations under §§ 19.82(1) and 19.32(1). At oral argument, the State indicated that the corporations considered in that opinion have continued to fulfill their purpose despite being subject to open meetings and public records laws. In addition, the Wisconsin Housing and Economic Development Authority operates under the express requirement that its records are open to the public with only limited exception. Wis. Stat. § 234.265.[22]

¶ 89. Finally, we emphasize that not all economic development entities are quasi-governmental corporations subject to the open meetings and public records laws. We have determined that BDADC is a quasi-governmental corporation because it resembles a governmental corporation.

¶ 90. However, BDADC could be organized differently. BDADC does not have to receive all of its income from public funds and interest on those funds, its assets

---

[22] The dissent overstates the consequences of our decision with its "sky is falling" discourse. It describes the open meetings and public records laws as "minefield[s]," dissent, ¶ 141, and forewarns of doom, *id.*, ¶ 127. As noted above, many economic development entities have been operating successfully as a part of local government. Indeed the sky remains intact above those communities throughout the state.

do not have to revert to the City in case of dissolution or liquidation, it did not have to be housed in the City municipal building, it did not have to be included on the City website. It does not have to open its records to the City, it does not have to submit its annual management plan to the City, it does not have to have City officials serving as ex officio members of its board, and the City does not have to be BDADC's only client. These are choices that BDADC has made.[23]

¶ 91. The determination that BDADC is a quasi-governmental corporation subject to open meetings and public records laws is further supported by the policies of the open meetings and public records laws. The open meetings statutes are to be construed "liberally" to achieve the purpose of "complete information regarding the affairs of government as is compatible with the conduct of governmental business,"[24] and the public records statutes are to be "construed in every instance

---

[23] The dissent states that "the majority attacks the legitimacy" of the desire to engage in economic development without being subject to open meetings and public records laws. Dissent, ¶¶ 127–28. The dissent misstates our position. We question the legitimacy of doing so via a quasi-governmental corporation funded exclusively with public money and interest thereon and which further resembles a governmental corporation in function, effect, or status as set forth in the text.

[24] Wis. Stat. § 19.81 provides in relevant part:

(1) In recognition of the fact that a representative government of the American type is dependent upon an informed electorate, it is declared to be the policy of this state that the public is entitled to the fullest and most complete information regarding the affairs of government as is compatible with the conduct of governmental business. . . .

(4) This subchapter shall be liberally construed to achieve the purposes set forth in this section . . . .

with a presumption of complete public access, consistent with the conduct of governmental business."[25]

¶ 92. As we have noted, fostering economic development is also an important legislative directive. We must "foster the growth and diversification of the economy of the state"[26] so that Wisconsin is "an attractive place to live and work . . . ."[27] However, for the reasons set forth above, we are not convinced that determining that BDADC is subject to state open meetings and public records laws undermines this policy.

## VI

¶ 93. In this declaratory judgment action the State of Wisconsin seeks a declaration that BDADC is a quasi-governmental corporation and is subject to both the open meetings and public records laws, and had requested forfeitures against the members of the board

---

[25] Wis. Stat. § 19.31 provides:

> In recognition of the fact that a representative government is dependent upon an informed electorate, it is declared to be the public policy of this state that all persons are entitled to the greatest possible information regarding the affairs of government and the official acts of those officers and employees who represent them. Further, providing persons with such information is declared to be an essential function of a representative government and an integral part of the routine duties of officers and employees whose responsibility it is to provide such information. To that end, ss. 19.32 to 19.37 shall be construed in every instance with a presumption of complete public access, consistent with the conduct of governmental business. The denial of public access generally is contrary to the public interest, and only in an exceptional case may access be denied.

[26] Wis. Stat. § 560.01(1)(purposes of establishment of Department of Commerce).

[27] Wis. Stat. § 560.08(1)(providing for economic and community development planning and research programs).

for each violation of the open meetings law. As noted above, there is no specific request for public records involved in the current action. The State also seeks an order voiding actions taken at past meetings which were not open to the public and an award of reasonable attorney fees and costs.

¶ 94. BDADC contends that if this court decides that it is subject to open meetings and public records laws, such ruling should be made prospectively only. We agree.

■

¶ 95. As we discuss above, neither this court nor the court of appeals has previously interpreted the meaning of "quasi-governmental corporation" within the meaning of §§ 19.82(1) and 19.32(1). Normally a new rule applies retrospectively. However, applying a new rule to circumstances in which actors reasonably rely on contrary views may be unsettling. This court will therefore occasionally apply a new rule prospectively to limit such an effect. *Harmann v. Hadley,* 128 Wis. 2d 371, 377–78, 382 N.W.2d 673 (1986).

■

¶ 96. We examine three factors in deciding whether our determination is to apply retroactively or prospectively:

> (1) whether the decision establishes a new principle of law, either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed; (2) whether retroactive application would further or retard the operation of the new rule; and (3) whether retroactive application could produce substantial inequitable results.

*Wenke v. Gehl Co.*, 2004 WI 103, ¶ 71, 274 Wis. 2d 220, 682 N.W.2d 405.

¶ 97. In light of these factors, we conclude that the test for whether an entity is a quasi-governmental corporation subject to open meetings and public records laws should apply prospectively only. First, this is a case of first impression, and we have established a new standard that was not clearly foreshadowed. Second, applying the standard set forth here retroactively would not advance the rule with respect to open meetings. As we noted in *Buswell*, "[t]he public cannot go back and attend meetings [that violate open meetings law] when such meetings have already occurred." 301 Wis. 2d 178, ¶ 48.

¶ 98. Most important in the present case, though, is the third factor. Applying the approach established in this case retroactively may produce substantial inequitable results. Exposing BDADC and individual members to forfeitures on the basis of a reasonable interpretation of the statute where no appellate court had yet provided an interpretation is inequitable here. Additionally, issuing an order voiding any actions taken at past meetings not open to the public would be unduly unsettling to the persons and businesses involved with or relying on the actions.

## VII

¶ 99. In sum, we determine that an entity is a quasi-governmental corporation within the meaning of Wis. Stat. §§ 19.82(1) and 19.32(1) if, based on the totality of circumstances, it resembles a governmental corporation in function, effect, or status. Such a determination requires a case-by-case analysis. Considering

the facts of this case we conclude that BDADC is a quasi-governmental corporation subject to open meetings and public records laws.

¶ 100. The test for determining whether an entity is a quasi-governmental corporation applies to both open meetings law and public records law. However, our test is not to be applied to past violations, that is, for violations prior to the date of the release of this opinion. Because we today announce a new test, applying that test to past violations would be inequitable and unduly unsettling.

¶ 101. We apply our determination prospectively such that the defendants in the present case are not subject to forfeitures for past violations of the open meetings laws and we decline to void any actions taken at past meetings not open to the public. Accordingly, we reverse the circuit court and remand to the circuit court to address the remaining request for attorney fees and costs and to enter judgment consistent with this opinion.

*By the Court.*—The order of the circuit court is reversed and the cause is remanded.

¶ 102. Justice ANNETTE KINGSLAND ZIEGLER did not participate.

¶ 103. DAVID T. PROSSER, J. (*dissenting*). The majority concludes that the Beaver Dam Area Development Corporation (BDADC) is a "governmental body" within the definition of Wis. Stat. § 19.82(1) (2005–06),[1] whose meetings are subject to Wisconsin's open meetings laws, Wis. Stat. §§ 19.83 to 19.98. It also concludes

---

[1] All references to the Wisconsin Statutes are to the 2005–06 version unless otherwise indicated.

that BDADC is an "authority" within the definition of Wis. Stat. § 19.32(1) that must comply with the state's public records laws, Wis. Stat. §§ 19.33 to 19.39.

¶ 104. Recognizing the importance and sensitivity of economic development in the state, the majority attempts to ameliorate its far-reaching decision by affirming its devotion to economic development and declining to award some of the relief the State requested. *See* majority op., ¶¶ 93–98. However, the majority fails to provide realistic guidance on how a non-profit economic development corporation can avoid conducting business in the fishbowl of the open meetings and public records statutes without severing its cooperative relationship with its municipal beneficiary and paying for all its economic development initiatives with private money. For multiple reasons, I respectfully dissent.

## I. BACKGROUND

¶ 105. In 2004 the State filed a complaint and amended complaint against BDADC seeking declaratory judgment that BDADC is a "quasi-governmental corporation" within the statutory definitions of "governmental body" and "authority" and, thus, subject to Wisconsin's open meetings and public records laws. As a result, this case involves BDADC during the time period leading up to the filing of the State's complaint and amended complaint. The circuit court found that BDADC is not a "quasi-governmental corporation" under either Wis. Stat. §§ 19.32(1) or 19.82(1) and denied declaratory judgment.

¶ 106. The following background facts are derived from the circuit court's findings of fact and are supplemented by facts in the record.

127

¶ 107. BDADC is a private, non-profit corporation that was organized under Wis. Stat. ch. 181 on January 31, 1997. The City of Beaver Dam (City) did not incorporate BDADC, and BDADC was not created pursuant to any constitution, statute, or ordinance. The exclusive purpose of BDADC, as stated in its bylaws, is "to engage in economic development and business retention within the corporate limits and lands which could become part of the corporate limits of the City of Beaver Dam and for all lawful purposes incident thereto." In conjunction with this stated purpose, BDADC does not provide services related to public health or safety to any county or municipality, including the City.

¶ 108. BDADC's Board of Directors (Board) has consisted of as many as 13 individuals,[2] 12 of whom have voting powers. These individuals, all residents of Beaver Dam, are selected for their "knowledge of economic development and business retention, cultural, civic, moral, public and other needs of the Beaver Dam area, and for general representation of varied elements or organizations of the area." The Board is therefore comprised of local industrialists, educational leaders, bankers, business leaders, and attorneys. The Board generally meets once each month over the lunch hour at the private places of employment of Board members. The mayor of Beaver Dam and the chairperson of Beaver Dam's community development committee both serve as ex officio voting members of the Board. The executive vice president of the Beaver Dam Area Chamber of Commerce serves as a non-voting member of the Board.

---

[2] We note that the Board's bylaws provide for 12 directors, but the record reflects that there were 13 directors serving during some of the pendency of this case. Only 12 BDADC directors have voting rights.

¶ 109. Board directors are nominated and elected solely by existing members of the Board. They serve without compensation. When a director's 3–year term expires, the Board elects a replacement. Except for the ex officio directors, a director may be removed from office by an affirmative vote of the majority of the Board. The electors of the City are the only persons who may remove the two ex officio directors. A director may also resign by filing his or her written resignation with the secretary of the Board.

¶ 110. BDADC's bylaws also provide for several officer positions. The bylaws state:

> The officers of [BDADC], except for the Executive Vice President, shall be elected from among the Board of Directors and shall consist of a President, a Treasurer, a Secretary, and such other Vice-Presidents as the Board of Directors may choose to elect. An Executive Vice President shall be appointed by majority vote of the Board of Directors and need not be a member of the Board of Directors.

Under this arrangement, the Executive Vice President is the only compensated, full-time employee of BDADC and manages the day-to-day operations of the corporation.

¶ 111. Since its incorporation, BDADC has had a single paid employee. Trent Campbell (Campbell), former Economic Development Director of the City, was the Executive Vice President of BDADC from approximately April 1, 1997, until his resignation, effective January 1, 2005. The City did not control Campbell's day-to-day activities as Executive Vice President; he served at the pleasure of the Board and did not have any authority to enter into contracts on BDADC's behalf. The authority to contract for BDADC was reserved with the Board. While clerical assistance was available from

the City, Campbell did virtually all his own typing, faxing, and e-mailing. He had his own computer, which was not connected to a City network. Campbell never consulted with a City attorney for legal advice regarding BDADC business; the Board solicited independent legal counsel on an as-needed basis. Campbell left BDADC in early 2005, and neither he nor his replacement were or are City employees during their service as Executive Vice President of BDADC.

¶ 112. From its inception until this suit, BDADC leased an office from the City on the lower level of a municipal building. However, the Board did not hold its meetings in municipal buildings.

¶ 113. BDADC and the City entered into cooperation agreements on April 1, 1997, and January 1, 2004. The 2004 agreement, effective through December 31, 2023, replaced the 1997 agreement, which was originally to last until the end of 2006. Both agreements recognized that BDADC was "created for the purpose of encouraging and stimulating economic development within the City and lands which could become part of the corporate limits of the City."

¶ 114. The agreements provided that the City would furnish, upon request, office space, clerical support, copy and fax machine use, telephone use, and postage. In addition, the City was privy to BDADC's accounting records and finances at BDADC's office upon 10 days' prior written notice. The City also made funds raised through Tax Increment Financing (TIF) districts in the City's Tax Increment Financing Project Plan available to BDADC for economic development. TIF funds were granted under both the 1997 and 2004 agreements with the caveat that "[s]uch funds may be subject to program conditions as may be established

and approved by the City at the time of approval of the Project Plan or at the time of contribution of such funds to [BDADC]."

¶ 115. BDADC is funded primarily by allocations of the City's room tax[3] and interest on these allocations. The 1997 cooperation agreement provided that, under a City ordinance, 90 percent of all room tax proceeds would be deposited in an economic development fund. Seventy-five percent of this economic development fund was to be allocated and disbursed quarterly to BDADC to "be used to provide economic incentives (including related expenses) to encourage businesses to locate and/or expand within the City." The 2004 cooperation agreement increased this allocation to 90 percent of the City's economic development fund.

---

[3] A room tax is levied upon those businesses providing temporary lodging within the borders of the taxing municipality. The 1997 cooperation agreement between BDADC and the City referenced Wis. Stat. § 66.75, which provided: "The governing body of a municipality may enact an ordinance . . . imposing a tax on the privilege of furnishing, at retail . . . rooms or lodging to *transients* by hotelkeepers, motel operators and other persons furnishing accommodations that are available to the public[.]" Wis. Stat. § 66.75(1m)(a)(1995–96) (emphasis added).

In effect, transients, not *residents,* pay the room tax. The City of Beaver Dam's current room tax ordinance is illustrative:

> Pursuant to Wis. Stats. § 66.0615, for the privilege of furnishing at retail rooms or lodging to transients by hotel keepers, motel operators and other persons furnishing accommodations that are available to the public, irrespective of whether membership is required for use of the accommodations, a tax is imposed upon the retailers at the rate of five percent of the gross receipts for the lease or rental of such accommodations, rooms or lodging within the city, effective January 1, 1989.

City of Beaver Dam, Wisconsin Municipal Code § 2–124(b), *available at* http://www.municode.com/Resources/gateway.asp ?pid=12550&sid=49 (last visited June 27, 2008).

¶ 116. The 1997 and 2004 cooperation agreements included several clauses to protect the interests of BDADC and the City. Both agreements stated that BDADC was to submit a "management plan" and budget to the City for the succeeding calendar year. The management plan was to include "a description of the programs and activities [BDADC] intends to undertake during the calendar year." The agreements provided for voluntary termination by either party upon "gross misconduct" of the other, or termination by the City "upon structural change of [BDADC] by amendment of its Articles of Incorporation." Pursuant to the cooperation agreements, BDADC was required to obtain public liability insurance, automobile liability insurance, and employers liability insurance. The City was entitled to the following protections pursuant to the agreements:

Indemnity

[BDADC] shall indemnify and hold City harmless from and against any claims, demands, actions, causes of action, proceedings, actions and liabilities, together with all costs, expenses and disbursements (including reasonable attorneys fees and costs) incurred by the City as a result of the [BDADC]'s acts or omissions hereunder.

The agreements provided that "under no circumstances shall any alderperson, officer, official, director, member or employee of the City or [BDADC] have any personal liability arising out of this Cooperation Agreement, and no party shall seek or claim any such personal liability." Nothing in the cooperation agreements limited BDADC to having the City as its only client.

¶ 117. Pursuant to BDADC's original articles of incorporation, upon voluntary or involuntary dissolution or liquidation of BDADC, any remaining assets,

after payment of its liabilities, were to be distributed to or for the benefit of non-profit organizations located in Beaver Dam and used for economic development and business retention. BDADC's articles of incorporation were amended on February 25, 1997, to provide that upon dissolution any such assets would instead be transferred to the City.

¶ 118. BDADC cannot bind the City to any obligation or contract. Recommendations or proposals brought to the City by BDADC are considered or acted upon by the City under Wisconsin's public records and open meetings laws. As a result, the public is able to monitor the support provided by the City to BDADC, as well as the work of the BDADC that requires City action.

¶ 119. On July 15, 2004, the State filed a complaint against BDADC seeking declaratory judgment that BDADC is a "quasi-governmental corporation" subject to Wisconsin's open meetings and public records laws. The State's complaint sought a court order requiring BDADC to conduct its affairs in compliance with such laws.

¶ 120. On December 20, 2004, the State filed an amended complaint that reiterated its initial claims and added a claim of relief against individual members of the Board for violating open meetings and public records law by participating in several closed-session meetings. The State's amended complaint sought forfeitures between $25 and $300 from all members of the Board for each violation.

¶ 121. In 2005 BDADC negotiated with several businesses to attract new or expanded development to the Beaver Dam community. BDADC negotiated, but did not itself sign, a memorandum of understanding between Wal-Mart Stores East, LP and the City, to bring a large distribution center to the area. Beaver Dam Mayor John Hankes signed the agreement.

133

¶ 122. On February 2, 2006, the circuit court found that BDADC is not a "quasi-governmental corporation" as that term is used in Wis. Stat. §§ 19.32(1) and 19.82(1). Accordingly, the circuit court held that BDADC was not subject to open meetings and public records laws. The State's amended complaint against BDADC was dismissed with prejudice and the State appealed.

¶ 123. The court of appeals certified the appeal to this court pursuant to Wis. Stat. § (Rule) 809.61. The court of appeals asked this court to provide guidance regarding the meaning of the term "quasi-governmental corporation," as it is used in Wis. Stat. §§ 19.32(1) and 19.82(1). The court of appeals noted that "any set of factors used to determine whether a corporation is 'quasi-governmental' should flow from a developed discussion of legislative intent." The court of appeals requested this court to develop a test for determining whether a private economic development corporation is a "quasi-governmental corporation" and to apply that test to BDADC.

## II. ANALYSIS

¶ 124. I have four primary concerns with the majority's conclusion and analysis. The importance of these concerns cannot be appreciated without understanding the impact of the majority's interpretation of Wisconsin's open meetings and public records laws on private non-profit economic development corporations. Consequently, my analysis begins with a discussion of these laws.[4] I will then set forth each of my four concerns with the majority's conclusion and analysis.

---

[4] The analysis of Wisconsin's open meetings and public records laws in section A. of this dissent is aided by reference to two compliance guides published by the Wisconsin Department of Justice in 2007.

A

¶ 125. Wisconsin's open meetings and public records laws are founded on the premise that an informed electorate will produce the most effective representative government. Our legislature has enacted these statutes to provide for the broadest practical access to government. *See Hempel v. City of Baraboo,* 2005 WI 120, ¶ 22, 284 Wis. 2d 162, 699 N.W.2d 551. Declarations of policy in Wis. Stat. §§ 19.31 and 19.81, respectively, proclaim that the public is entitled to "the greatest possible information" and "the fullest and most complete information" regarding the affairs of government. At the same time, however, these declarations also qualify access to information with limiting phrases such as "consistent with the conduct of governmental business" and "compatible with the conduct of governmental business." Wis. Stat. §§ 19.31, 19.81. Thus, there is a strong, but not absolute, presumption in favor of disclosure of information relating to government affairs. *Hempel,* 284 Wis. 2d 162, ¶ 28.

¶ 126. When municipalities directly engage in economic development, their activities are subject to relevant open meetings and public records statutes. Accordingly, one motive for the proliferation of separate economic development corporations has been a desire to avoid the application of these laws. There are some people who believe that some facets of successful eco-

These compliance guides are entitled *Wisconsin Public Records Law Wis. Stat. §§ 19.31–19.39, Compliance Outline, August 2007,* and *Wisconsin Open Meetings Law: A Compliance Guide (2007).* They can be retrieved on the Internet at the following website addresses, respectively: http://www.doj.state.wi.us/AWP/2007OMCG-PRO/2007_PR_Outline.pdf (last visited June 27, 2008); http://www.doj.state.wi.us/AWP/2007OMCG-PRO/2007_OML_Compliance_Guide.pdf (last visited June 27, 2008).

nomic development are not compatible with the sort of real-time disclosure these laws require.

¶ 127. The majority attacks the legitimacy of this motivation when it declares that "we cannot countenance a government body circumventing the legislative directive for an open and transparent government by paying an entity to perform a governmental function." Majority op., ¶ 4. It construes the statutory term "quasi-governmental corporation" so broadly that it is likely to close off the option of a non-profit economic development corporation that is beyond the reach of these statutes. It will mean little to persons involved in economic development to be assured that a majority of the Wisconsin Supreme Court is "cognizant of the realities of economic development and the need, at times, for flexibility and confidentiality," *id.*, if the majority has made that flexibility and confidentiality nearly impossible.

¶ 128. Compliance with Wisconsin's public records and open meetings laws requires subject entities to establish various notices, procedures, and policies. Satisfying these requirements will not be easy. The majority tries to soften its holding by pointing to a few exceptions to open meetings and public records laws, *see* majority op., ¶¶ 81–87, and by acknowledging that some circumstances might require "that the harm to the public from disclosure should be balanced against the benefit of disclosure to the public." Majority op., ¶ 84. Nonetheless, many of the requirements that will likely become applicable to private economic development corporations after this decision will create significant administrative burdens that will necessitate time and substantial expense, and compromise the confidentiality of subject materials.

136

¶ 129. For example, the public records laws require an impacted entity (an "authority" under Wis. Stat. § 19.32(1)) to establish many policies and procedures to grant public access to "records."[5] "Records" can include items like e-mail messages and telephone call logs that are created or kept by an "authority" and are not purely personal.[6]

¶ 130. Entities subject to public records laws must establish public records policies. An "authority," including a "quasi-governmental corporation," "shall adopt, prominently display and make available for inspection and copying at its offices . . . a notice containing a description of its organization and the established times and places at which" the public may obtain and access records and the costs thereof. Wis. Stat. § 19.34(1). This notice must also "separately

---

[5] Wis. Stat. § 19.32(2) states:

> "Record" means any material on which written, drawn, printed, spoken, visual or electromagnetic information is recorded or preserved, regardless of physical form or characteristics, which has been created or is being kept by an authority. "Record" includes, but is not limited to, handwritten, typed or printed pages, maps, charts, photographs, films, recordings, tapes (including computer tapes), computer printouts and optical disks. "Record" does not include drafts, notes, preliminary computations and like materials prepared for the originator's personal use or prepared by the originator in the name of a person for whom the originator is working; materials which are purely the personal property of the custodian and have no relation to his or her office; materials to which access is limited by copyright, patent or bequest; and published materials in the possession of an authority other than a public library which are available for sale, or which are available for inspection at a public library.

[6] Access to covered records is broad, but necessarily limited by considerations of privacy and security. *See* Wis. Stat. § 19.35(1)(am)1.-3. (listing examples of items to which the right to inspect, copy, or record a "record" does not apply).

identify each position of the authority that constitutes a local public office or a state public office." *Id.*

¶ 131.　Entities subject to public records laws must also establish designated office hours for access to public records. An authority that maintains regular office hours where records in the custody of the entity are kept "shall permit access to the records . . . at all times during those office hours, unless otherwise specifically authorized by law." § 19.34(2). If no regular office hours are kept, the authority must either provide access to the records upon 48 hours written or oral notice of intent to inspect or copy a record, or establish a period of at least two consecutive hours per week during which access to records of the authority is permitted. Wis. Stat. § 19.34(2)(b)1.-2.

¶ 132.　In addition to availability requirements, an authority must provide facilities "comparable to those used by its employees to inspect, copy and abstract" the record or records during established office hours. Wis. Stat. § 19.35(2). However, an authority is not required to purchase or lease photocopying or similar equipment or provide a separate room for public use to satisfy this requirement. *Id.*

¶ 133.　A custodian of a record subject to public records laws must *respond* to a public records request. Wis. Stat. § 19.35(4). The custodian must state specific, reasons for denying a public records request. *Osborn v. Bd. of Regents of Univ. of Wis. Sys.*, 2002 WI 83, ¶ 16, 254 Wis. 2d 266, 647 N.W.2d 158. This requirement creates an administrative burden even if access to records is not warranted. The court of appeals addressed the requirements of Wis. Stat. § 19.35(4) in *ECO, Inc. v. City of Elkhorn*, 2002 WI App 302, 259 Wis. 2d 276, 655 N.W.2d 510:

Open records law mandates action once a request is received; Wis. Stat. § 19.35(4) addresses time for compliance and states, in relevant part:

> (a) Each authority, upon request for any record, *shall,* as soon as practicable and without delay, *either fill the request or notify the requester of the authority's determination to deny the request in whole or in part and the reasons therefor.* (Emphasis added.)

Thus, under § 19.35(4)(a), receipt of an open records request triggers either a duty to respond to the request or a duty to produce the requested records. Here, the City neither responded to the April 24, 1996 request nor produced the requested documents. It is incumbent upon the custodian of the public record who refused the demand of inspection to "state specifically the reasons for this refusal." *Hathaway [v. Joint School Dist. No. 1, City of Green Bay]*, 116 Wis. 2d [388,] 396[, 342 N.W.2d 682 (1984)] (citation omitted). A custodian's denial of access to a public record must be accompanied by a statement of the specific public policy reasons for the refusal. *Chvala v. Bubolz,* 204 Wis. 2d 82, 86–87, 552 N.W.2d 892 (Ct. App. 1996). The City did not provide any response whatsoever and therefore did not comply with open records law.

*ECO, Inc.,* 259 Wis. 2d 276, ¶ 24.

¶ 134. Even if an authority need not make requested records available for inspection or copying, it will still be burdened with the duty to respond to a request "as soon as practicable and without delay" and to state its reasons for refusal. Wis. Stat. § 19.35(4)(a). If the request for records is in writing, a denial or partial denial of access to records must also be in writing. Wis. Stat. § 19.35(4)(b). Thus, an authority's statutory choices are twofold: comply or deny. *WTMJ, Inc. v. Sullivan,* 204 Wis. 2d 452, 457, 555 N.W.2d 140

(Ct. App. 1996). "[C]ompliance at some unidentified time in the future[] is not authorized by the open records law." *Id.* at 458. If an authority withholds a record or delays granting access to a record after a written request is made, a requester may immediately bring a mandamus action asking a court to order release of the record. Wis. Stat. § 19.37(1); *WTMJ,* 204 Wis. 2d at 461. Any authority that "arbitrarily and capriciously denies or delays response to a request" may expose itself to punitive damages and a forfeiture of not more than $1,000. Wis. Stat. § 19.37(3)-(4).

¶ 135. Wisconsin's open meetings laws create additional responsibilities for a "governmental body," including a "quasi-governmental corporation." Wis. Stat. § 19.82(1). The two basic requirements of the open meetings laws are: (1) public notice of meetings; and (2) meetings must be held in open session. Wis. Stat. § 19.83(1). The chief presiding officer of a governmental body or such person's designee must give notice of meetings to (1) the public; (2) "those news media who have filed a written request for such notice;" and (3) "the official newspaper designated under [state statute] or, if none exists, to a news medium likely to give notice in the area." Wis. Stat. § 19.84(1)(b).

¶ 136. The statute specifies how public notice must be given. The public notice "shall set forth the time, date, place and subject matter of the meeting, including that intended for consideration at any contemplated closed session, in such form as is reasonably likely to apprise members of the public and the news media thereof." Wis. Stat. § 19.84(2). The public notice of a meeting of a governmental body may also provide for a period of public comment. *Id.* Public notice of a meeting of a governmental body "shall be given at least 24 hours prior to" its commencement "unless for good

cause such notice is impossible or impractical, in which case shorter notice may be given, but in no case may the notice be provided less than 2 hours in advance of the meeting." Wis. Stat. § 19.84(3). "Separate public notice shall be given for each meeting of a governmental body at a time and date reasonably proximate to the time and date of the meeting." Wis. Stat. § 19.84(4).

¶ 137. The specificity necessary to satisfy the notice requirement was recently addressed by this court. *See State ex rel. Buswell v. Tomah Area School Dist.,* 2007 WI 71, ¶¶ 28–32, 301 Wis. 2d 178, 732 N.W.2d 804 (establishing a three-factor reasonableness test to determine whether subject-matter in a meeting notice was specific enough to satisfy Wis. Stat. § 19.84). As a result, it may not be satisfactory for a non-profit economic development corporation to list "discussion of economic development prospects" month after month without identifying the prospects.

¶ 138. The "open session" requirement of Wis. Stat. § 19.83 is also a mandate. All "governmental body" business of any kind, formal or informal, must be initiated, discussed and acted upon in "open session," unless one of the exemptions set forth in Wis. Stat. § 19.85(1) applies. Wis. Stat. § 19.83(1). An "open session" is defined as "a meeting which is held in a place reasonably accessible to members of the public and open to all citizens at all times." Wis. Stat. § 19.82(3).

¶ 139. BDADC's current arrangement of meeting at the private business places of Board members over the lunch hour is likely deficient. The policy of openness favors governmental bodies holding their meetings in public places, such as a municipal hall or school, rather than on private premises. *See* 67 Wis. Op. Att'y Gen. 125, 127 (1978). BDADC made a point of holding its meetings away from the municipal building in which it once had its office.

141

¶ 140. Our decision in *Sands v. Whitnall School District*, 2008 WI 89, 312 Wis. 2d 1, 754 N.W.2d 439, this term, is likely to affect any "governmental body" that is authorized by Wis. Stat. § 19.85(1) to discuss certain business in closed session. The gist of the *Sands* decision is that the discussion in a properly-conducted closed meeting is no longer off limits to discovery in proper litigation.

¶ 141. In sum, compliance with the requirements of Wisconsin's public records and open meetings laws will be not be a cakewalk. The requirements set forth above touch only part of the regulatory minefield that many private economic development corporations will now be forced to travel.[7] These requirements could place significant administrative and practical burdens on a non-profit economic development corporation like BDADC that has only one paid employee. Responding to requests for access to records that may be confidential, privileged, or time-sensitive could be a great hindrance to the work product of a single individual.[8] Furthermore, the potential expense of lost productivity from complying and taking steps to avoid the necessity of complying, and additional costs of legal counsel to assure compliance, could be burdensome.

¶ 142. To sum up, open meetings and public records requirements established by the majority's

---

[7] It may be more accurate to observe that nearly *all* private economic development corporations in Wisconsin should be prepared to address these new compliance concerns, as the majority opinion provides such scant guidance regarding the definition of "quasi-governmental corporation" as to leave all current EDCs naked to compliance issues.

[8] The law appears to require a Board member to come over to the office and work on a public records request if BDADC's single paid employee is out of the office on work, vacation, or illness.

142

holding will likely present burdens and obstacles for many economic development corporations in Wisconsin.

B

¶ 143. Applying the requirements of the open meetings and public records laws to a non-profit economic development corporation with a single employee should raise serious questions without additional analysis. But I have four additional concerns with the majority opinion:

(1) The majority opinion provides virtually no guidance to the public regarding how to determine whether an entity is a "quasi-governmental corporation." The majority's use of a "totality of circumstances" test, without specifying a list of factors to be considered or identifying what factors are critical or dispositive, is extraordinarily unhelpful;

(2) The majority opinion relies on precedents from Maryland, New York, and Florida that interpret and apply unique statutory language in those states. It is a mistake to try to interpret the meaning of an undefined statutory term in Wisconsin based on the interpretation of different terms in other states;

(3) The majority opinion fails to analyze the statutory and legislative history behind the legislature's choice of the term "quasi-governmental corporation" in a serious and convincing manner; and

(4) The majority opinion misapplies the law to the facts, even under the "test" it has chosen, and relies upon irrelevant facts that occurred after the filing of this suit.

1. Guidance

¶ 144. This case involves a pure question of statutory interpretation—namely, determining the meaning

143

of "quasi-governmental corporation"—so that certain private entities will know whether their actions are subject to Wisconsin's open meetings and public records laws. It is deeply troubling that the majority opinion offers no clear test, no determinative factor (or even a set of enumerated factors), for interested parties and courts to apply to determine whether a particular entity is a "quasi-governmental corporation." Instead, the majority advises that "[i]f an entity does not want to be subject to the open meetings and public records laws, then it should change the circumstances under which it operates." Majority op., ¶ 7. This phantom guidance is bound to have a chilling effect on entities who seek lawfully to avoid the constraining requirements of these statutes.[9]

¶ 145. The majority opinion claims to recognize "the need . . . for flexibility and confidentiality" in the conduct of municipal economic development initiatives. Majority op., ¶ 4. However, it does not provide crucial guidance required by those engaged in the development, management, and day-to-day operation of entities created to serve such policy goals. Instead, the majority cryptically sets forth only "*some* of the factors to be examined in determining what constitutes a

---

[9] The majority seeks to justify its "totality of the circumstances" test by pointing to four of this writer's decisions in which a "totality of the circumstances" test was employed in constitutional determinations in criminal law. Majority op., ¶ 46 n.11. The test for determining "reasonable suspicion" to make a *Terry* stop or "probable cause" to conduct a search strikes this writer as different from the proper test for determining when uncompensated citizens seeking to promote economic development in their community must comply with open meetings and public records laws or face prosecution by the State of Wisconsin.

'quasi-governmental corporation' subject to open meetings and public records laws," majority op., ¶ 8 (emphasis added), leaving no usable test with which one might determine what is meant by this term in Wis. Stat. §§ 19.32(1) and 19.82(1).

¶ 146. Although it might be easier to ask the legislature to clarify the scope and meaning of "quasi-governmental corporation," this course is not available in the instant litigation. Hence, it is our duty to make our best judgment of what the term means. The majority's answer fosters uncertainty by empowering judges to impose penalties on people, on a case-by-case basis, with virtually no guidance of who will get whacked.

¶ 147. The majority was given options, and it has attempted to meld different tests together to reach a desired outcome. The briefs of the parties and amici set forth several choices to give meaning to "quasi-governmental corporation." Two primary options (based on formal Attorney General opinions) were suggested. A third vaguer option (based on a noted treatise) was also submitted, and the majority seems at least partially to embrace it.[10] *See* majority op., ¶¶ 9, 35, 79 (discussing "function, effect, or status"). In essence, however, the majority chose "none of the above." Any of the suggested options would be preferable to the majority's open-ended, non-specific "test": "In sum, we determine that an entity is a quasi-governmental corporation within the meaning of Wis. Stat. §§ 19.82(1) and 19.32(1) if,

---

[10] The majority opinion recognizes that foreign jurisdictions and scholars have suggested enumerated multi-factor tests to determine whether entities are subject to open meetings and public records laws. *See* majority op., ¶ 63 n.14. The majority inexplicably chooses to leave Wisconsin law confused while recognizing that scholars and other jurisdictions establish enumerated guidelines to aid practitioners.

based on the totality of circumstances, it resembles a governmental corporation." Majority op., ¶ 99. This "test" requires the public to traverse dense fog without any fog lines.

¶ 148. One option the majority could have selected would limit "quasi-governmental corporations" to those entities created expressly by government under statutory authority. A 1977 Attorney General opinion discussing whether the Palmyra Volunteer Fire Department was subject to the open meetings law interpreted Wis. Stat. § 19.82(1) and concluded that "[e]ven though a corporation may serve some public purpose, it is not a 'governmental or quasi-governmental corporation' under [Wis. Stat. § 19.82(1)] unless it also is *created directly by the Legislature or by some governmental body pursuant to specific statutory authorization or direction.*" 66 Wis. Op. Att'y Gen. 113, 115 (1977) (emphasis added). The Attorney General opined that the volunteer fire department in question did not meet the definition in Wis. Stat. § 19.82(1) because it was not created directly by the legislature or another governmental body. *Id.* at 114–15.

¶ 149. The "created-directly-by-government" test may be too easy to skirt, but it is clear. BDADC could not be classified as a quasi-governmental corporation if this test were applied.

¶ 150. The second potential option comes from a 1991 Attorney General opinion, 80 Wis. Op. Att'y Gen. 129 (1991). The majority opinion tries to utilize this opinion, but it fails to explicitly enumerate the factors that are important or worthy of consideration. By embracing an open-ended "totality" test, the majority aggravates the ambiguity in the 1991 opinion.

¶ 151. The 1991 Attorney General opinion focused on several factors to determine whether two

private corporations resembled a governmental corporation enough to be a "quasi-governmental corporation." *Id.* at 136. It favored an analysis on a "case by case basis, in light of all the relevant circumstances." *Id.* The opinion was candid "that adopting a fact-based test to determine whether a corporation is a 'quasi-governmental corporation' . . . creates some uncertainty as to the applicability of the open meetings law in particular cases." *Id.* at 137.

¶ 152. Using the 1991 opinion, the Wisconsin Department of Justice (DOJ) subsequently compiled the following non-exclusive list of six factors:

> (1) whether the corporation serves a public purpose; (2) the extent to which the corporation receives public funding for its operation; (3) whether the bylaws of the corporation either reserve positions on the board of directors for government officials or employees, or give a government actor the power to appoint government officials and employees to the board of directors; (4) whether the government in fact appointed government employees or officials to the corporation's board of directors; (5) whether government employees served as officers of the corporation; and (6) the extent to which the corporation was housed in government offices, used government equipment and was staffed by government employees.

*Wisconsin Open Meetings Law: A Compliance Guide (2007)* 4 (citing 80 Wis. Op. Att'y Gen. 129, 136 (1991)), *available at* http://www.doj.state.wi.us/AWP/2007 OMCG-PRO/2007_OML_Compliance_Guide.pdf (last visited June 27, 2008).

¶ 153. It should be noted that the DOJ list does not include the factor that was dispositive in the 1977 opinion: namely, the corporation's creation by govern-

ment.[11] Moreover, it begins with the elusive question "whether the corporation serves a public purpose," a question that could be debated at length in a class on political philosophy.

¶ 154. The State's brief recognizes that the 1991 Attorney General opinion is "not free from ambiguity" and that "the multitude of factors applied make it cumbersome as the basis for a general standard that yields a predictable result." This evaluation of the 1991 Attorney General opinion is consistent with the DOJ's prior commentary on the guidance in that opinion. In 1996 the DOJ's open meetings compliance guide stated, with regard to 80 Wis. Op. Att'y Gen. 129 (1991): "There is no clear-cut test for determining whether a particular corporation resembles a governmental corporation closely enough to be considered 'quasi-governmental.' " *Wisconsin Open Meetings Law: A Compliance Guide (1996)* 2.[12] It is ironic that the 1996 DOJ open meetings law compliance guide—a guide that someone in the position of organizing a private, non-profit economic development corporation in early 1997 might reference —concluded that there was "no clear-cut test" to deter-

---

[11] The language in the open meetings law—with respect to a "quasi-governmental corporation"—has not changed since 1976. The "quasi-governmental corporation" language in the public records statute has been in place since 1981. The interpretation of this language keeps evolving, however, so that the dispositive factor in the 1977 Attorney General opinion no longer even appears on the Department of Justice's list of factors to be considered.

[12] The Department of Justice's 2003 open meetings law compliance guide included this same language, which has been removed from its 2007 guide during the pendency of this litigation. *Compare Wisconsin Open Meetings Law: A Compliance Guide (2003)* 3, *with Wisconsin Open Meetings Law: A Compliance Guide (2007)* 3–4.

mine whether a particular entity was subject to Wisconsin freedom of information laws.

¶ 155. The 1991 Attorney General opinion dealt with two private corporations whose boards, employees, and day-to-day operations were effectively controlled by the City of Milwaukee. Thus, the result of the opinion is understandable. However, the analysis is murky, and is based far more on policy than legislative intent.

¶ 156. The third option presented to define "quasi-governmental corporation" is that found in 1 McQuillin, *Municipal Corporations* § 2.13 (3d rev. 1999). The McQuillin treatise discusses "quasi-public corporations," which could be viewed as similar, although not identical, to quasi-governmental corporations. *Id.* The 1991 Attorney General opinion quoted the 1990 version of the McQuillin treatise: "The term 'quasi-public [or quasi-governmental] corporation' is not per se public or governmental. On its face, the term connotes that it is not a public corporation but a private one. But 'quasi' indicates that the private corporation has some resemblance to a public corporation in function, effect or status." 80 Wis. Op. Att'y Gen. at 135 (quoting McQuillin, *Municipal Corporations* § 2.13 (3rd ed. rev. 1987 & Supp. 1990)).

¶ 157. The "function, effect or status" test in McQuillin presents an enumerated list of three factors to consider to determine whether an entity is a quasi-governmental corporation subject to open meetings and public records laws. These three factors, although rather vague, present a clearer starting point than the "totality of circumstances" and "resembles a governmental corporation" standards provided by the majority. Majority op., ¶ 99. However, the "function, effect or status" test is easily manipulated based on what one characterizes as a governmental function, an entity's effect, or an entity's status.

¶ 158. I disagree with the majority's conclusion that BDADC is a "quasi-governmental corporation" for purposes of Wisconsin open meetings and public records laws. However, the majority's conclusion is less troubling than the lasting negative impact of the imprecision in the majority's holding. Had the majority chosen to enumerate specific factors to direct the public, today's decision might contain some redeeming value as a guide. In my view, it does not.

2. Foreign Precedents

¶ 159. The majority's reliance on foreign precedents for guidance may be creative, but it is fundamentally unsound. The case before this court involves the interpretation of *Wisconsin* statutes. The term "quasi-governmental corporation" is not found in the Maryland, New York, or Florida cases cited by the majority. The majority tacitly recognizes its leap of logic,[13] but still plows through a result-oriented analysis, disregarding the language of these states' open meetings and public records laws. The majority treats the interpretation of out-of-state statutes by out-of-state courts as if we were collectively developing the common law of freedom of information.

¶ 160. *City of Baltimore Development Corporation v. Carmel Realty Associates,* 910 A.2d 406 (Md. 2006), involved two questions of statutory interpretation: (1) whether the City of Baltimore Development Corporation (BDC) was a "public body" within the meaning of

---

[13] "Although the determination of whether an entity is subject to open meetings and public records laws depends on the respective statutory language of each state, the interpretations rendered by courts in other jurisdictions are instructive." Majority op., ¶ 50.

Maryland's Open Meetings Act (Md. Code Ann., State Gov't §§ 10–501—10–512 (LexisNexis 2004); and (2) whether the BDC was an "instrumentality" of the City of Baltimore for purposes of Maryland's Public Information Act (Md. Code Ann., State Gov't §§ 10–601 —10–628 (LexisNexis 2004)). *Carmel Realty*, 910 A.2d at 410.

¶ 161. The Maryland Court of Appeals found that BDC performed many purely public functions and was inextricably linked to the City of Baltimore. *Id.* at 424–25. BDC's bylaws gave the mayor of Baltimore the power to appoint or nominate members of BDC's board of directors, remove members of the board, including the Chairman of the Board, and to appoint directors when positions on the board were vacated. *Id.* at 422, 425. BDC could implement, oversee, and encourage public and private development and rehabilitation projects to increase the city's tax base. *Id.* at 424. BDC was tasked with the attraction of new businesses, retention of existing businesses, and the stimulation and encouragement of growth and expansion of commercial office uses, manufacturing, warehousing, distribution, research, and development. *Id.* at 425. If BDC ceased to exist, tangible property purchased with funds attached to that contract would revert to the city. *Id.* Over 80 percent of BDC's budget was provided by the city. *Id.*

¶ 162. The Maryland Court of Appeals set forth its analysis under the heading "Statutory Interpretation." *Id.* at 417. In Maryland, a "public body" is subject to notice provisions of the Open Meetings Act. *See id.* at 419–20; Md. Code Ann., State Gov't § 10–501(c) (Lexis-Nexis 2004). "Public body" is *defined* in the Maryland Code.[14]

---

[14] "Public body" in the Maryland Code means an entity that: "(i) consists of at least 2 individuals" and "(ii) is created by: 1. the

¶ 163. In interpreting and applying the *defined term* "public body" to BDC, the Maryland Court of Appeals concluded that Md. Code Ann., State Gov't § 10–502(h)(2) introduced a new concept and was an alternative to § 10–502(h)(1) because it set forth a different set of public bodies from those described in § 10–502(h)(1). *Carmel Realty*, 910 A.2d at 420. The court further explained that if § 10–502(h)(2) had been a subsidiary clause, it would have been designated as "§ 10–502(h)(1) . . . (iii)." *Id.* The court further held that because there was no evidence that BDC was created by a specific act or order under § 10–502(h)(1), the court would have to consider whether BDC fell under § 10–502(h)(2). *Id.* at 421.

¶ 164. The court held that BDC was a public body under § 10–502(h)(2) because the parties did not dispute that BDC's bylaws required it to be a multimember board, that its board of directors consisted of at least

Maryland Constitution; 2. a State statute; 3. a county charter; 4. an ordinance; 5. a rule, resolution, or bylaw; 6. an executive order of the Governor; or 7. an executive order of the chief executive authority of a political subdivision of the State." Md. Code Ann., State Gov't § 10–502(h)(1) (LexisNexis 2004).

"Public body" includes: "(i) any multimember board, commission, or committee appointed by the Governor or the chief executive authority of a political subdivision of the State, or appointed by an official who is subject to the policy direction of the Governor or chief executive authority of the political subdivision, if the entity includes in its membership at least 2 individuals not employed by the State or the political subdivision; and (ii) the Maryland School for the Blind." Md. Code Ann., State Gov't § 10–502(h)(2) (LexisNexis 2004).

The Maryland Code also excludes certain entities from the definition of "public body." Md. Ann. Code., State Gov't § 10–502(h)(3) (LexisNexis 2004) (excluding, for example, "any single member entity" and "any grand jury.").

two individuals not employed by the city, and that the board was nominated or appointed by the mayor. *Carmel Realty*, 910 A.2d at 421. The court concluded that since there were no purely private functions of the BDC, it was consistent with the intent of the Maryland Open Meetings Act that the deliberations of the BDC be open to the public. *Id.* at 425.

¶ 165. The majority characterizes the Maryland Court of Appeals' analysis as applying a "totality of the circumstances" approach to the defined term "public body." Majority op., ¶ 54. This is not accurate. The Maryland court instead interpreted a *defined* statutory term to ascertain whether BDC was subject to Maryland's open meetings laws pursuant to that definition. *Carmel Realty*, 910 A.2d at 419–25. The analysis of a defined statutory term ("public body") in Maryland is not much use to interpretation of an undefined statutory term ("quasi-governmental corporation") in two Wisconsin statutes.

¶ 166. The Maryland Court of Appeals next turned to the second question presented, namely whether BDC was an "instrumentality" for purposes of Maryland's Public Information Act. *Id.* at 425–26. In Maryland, a "public record" is subject to the state's public records laws. *See id.* at 426; Md. Code Ann., State Gov't § 10–611(g)(1)(i) (LexisNexis 2004). "Public record" is a defined term and means "the original or any copy of any documentary material that: (i) is made by a unit or instrumentality of the State government or of a political subdivision or received by the unit or instrumentality in connection with the transaction of public business." *Id.*, § 10–611(g)(1)(i).

¶ 167. The Maryland Court of Appeals held that BDC was an "instrumentality" of the city. *Carmel Realty*, 910 A.2d at 426. The court stressed that the

holding was consistent with the purpose of the Maryland Public Information Act and with the Maryland General Assembly's intent when it enacted the act. *Id.* The court looked to a standard dictionary for the definition of "instrumentality" and noted that "[i]nstrumentality is defined as 'the quality or state of being instrumental' and instrumental is defined as 'serving as a means, agent, or tool.' " *Id.* at 427 (quoting *Merriam Webster's Collegiate Dictionary* 607 (10th ed. 1998)). The court also examined a number of BDC's characteristics to conclude it was an "instrumentality," including the following:

> The BDC's Board of Directors, to include the Chairman of the Board, are nominated or appointed by the Mayor of Baltimore; he has the power to remove members of the Board before their four year terms are up; the Mayor also has the power to fill vacancies; the City's Commissioner of the Department of Housing and Community Development and the City's Director of Finance are permanent members of the Board; the BDC receives a substantial portion of its budget from the City; the BDC has a tax exempt status under the Internal Revenue Code; pursuant to the City's contract with the BDC, if it should cease to exist, the City would control the disposition of the BDC's assets; BDC is also authorized to prepare and adopt Urban Renewal Plans, Unit Development, Industrial Retention Zones, and Free Enterprise Zones which are traditionally governmental functions. We also note that the City Solicitor represented the BDC in this matter.

*Carmel Realty,* 910 A.2d at 428 (footnotes omitted).

¶ 168. The statutory interpretation problem in the instant case is similar to the problem faced by the Maryland Court of Appeals in interpreting the undefined term "instrumentality." Hence, the majority opinion turns to some of the same methods to construe

"quasi-governmental corporation," such as using the dictionary. *See* majority op., ¶ 32. However, the majority's description of the Maryland case blends the Maryland court's separate analyses of defined and undefined statutory terms into an evaluation of the "totality of circumstances." *See* majority op., ¶ 54. This allows the majority to analogize *Carmel Realty* to the instant case. Majority op., ¶¶ 66, 68, 72.

¶ 169. *Buffalo News, Inc. v. Buffalo Enterprise Development Corp.,* 644 N.E.2d 277 (N.Y. 1994), involved the question of whether the Buffalo Enterprise Development Corporation (BEDC), a non-profit corporation administering government loan programs, was an "agency" within the meaning of New York's Freedom of Information Law (FOIL). *Id.* at 278. "Agency" was defined by statute as "any state or municipal department, board, bureau, division, commission, committee, public authority, public corporation, council, office or *other governmental entity* performing a governmental or proprietary function for the state or any one or more municipalities thereof, except the judiciary or the state legislature." N.Y. Pub. Off. Law § 86, subd. 3 (McKinney 1990) (emphasis added).

¶ 170. The New York Court of Appeals concluded that BEDC was an "agency" under FOIL, constituting a "governmental entity." *Buffalo News,* 644 N.E.2d at 279–80. BEDC's stated purposes were "to relieve and reduce unemployment, to promote and to provide for additional and maximum employment . . . [to] encourag[e] [ ] development . . . in the community . . . and to lessen the burdens of government and to act in the public interest." *Id.* at 278 (brackets in original). The court observed that BEDC's purposes were undeniably governmental. *Id.* at 279. BEDC was "*created exclusively by and for the City of Buffalo* to attract invest-

ment and stimulate growth in Buffalo's downtown and neighborhoods. . . . Moreover, the BEDC describes itself in its financial reports and public brochure as an 'agent' of the City of Buffalo." *Id.* (emphasis added).

¶ 171. The New York statute's definition of "agency" included a "governmental entity," not a *quasi-*governmental entity. N.Y. Pub. Off. Law § 86, subd. 3 (McKinney 1990). The *Buffalo News* court held that BEDC was, in effect, an arm of government. *See Buffalo News,* 644 N.E.2d at 279. By avoiding any discussion of the statute at play in *Buffalo News,* the majority here buries this crucial distinction. *See* majority op., ¶¶ 55–56. BEDC was viewed as a *governmental* entity, not something *resembling* a governmental entity. *Compare Buffalo News,* 644 N.E.2d at 279 *with* majority op., ¶ 63. Furthermore, the New York court's decision was premised upon its determination that BEDC was "created exclusively by and for the City of Buffalo." *Buffalo News,* 644 N.E.2d at 279. The City of Beaver Dam did not create BDADC.

¶ 172. Finally, the majority discusses *News and Sun-Sentinel Co. v. Schwab, Twitty & Hanser Architectural Group, Inc.,* 596 So. 2d 1029 (Fla. 1992), which involved the following question: "Does a corporation act on behalf of a public agency when hired by a county to perform professional architectural services for the construction of a school so as to be subject to the provisions of Chapter 119 of the Florida Statutes?" *Id.* at 1030. "Agency" is defined broadly in the Florida Statutes:

> "Agency" means any state, county, district, authority, or municipal officer, department, division, board, bureau, commission, or other separate unit of government created or established by law and any other public or private agency, person, partnership, corporation, *or business entity acting on behalf of any public agency.*

Fla. Stat. Ann. § 119.011(2) (West 1989) (emphasis added).[15]

¶ 173. In *News and Sun-Sentinel,* an architectural firm, Schwab, Twitty & Hanser Architectural Group, Inc., a private corporation, contracted with a school board to provide architectural services in relation to the construction of school building facilities. *News and Sun-Sentinel,* 596 So. 2d at 1030. A reporter, pursuant to Florida Statutes ch. 119, requested that he be allowed to inspect the files in the corporation's possession related to the projects. *Id.* The firm refused and argued that it was not an agency as set forth in Fla. Stat. § 119.011(2). *Id.*

¶ 174. In siding with the architectural firm, the Florida Supreme Court noted that courts interpreting "agency" under Fla. Stat. § 119.011(2) make a determination based on the "totality of the factors." *Id.* at 1031 (citations omitted). The court provided a non-exclusive list of factors considered in its analysis.[16] The court

---

[15] The Tennessee Supreme Court has observed that Florida's public records disclosure scheme should be distinguished from other jurisdictions because "the terms of its public records statute explicitly extend to private entities 'acting on behalf of a[ny] public agency.' " *Memphis Publ'g Co., v. Cherokee Children & Family Servs., Inc.,* 87 S.W.3d 67, 78 n.12 (Tenn. 2002)(citing *News and Sun-Sentinel Co. v. Schwab, Twitty & Hanser Architectural Group, Inc.,* 596 So. 2d 1029, 1031 (Fla. 1992) (quoting Fla. Stat. § 119.011(2))).

[16] These factors were:

(1) the level of public funding; (2) commingling of funds; (3) whether the activity was conducted on publicly owned property; (4) whether services contracted for are an integral part of the public agency's chosen decision-making process; (5) whether the private entity is performing a governmental function or a function which the public agency otherwise would perform; (6) the extent of the public agency's involvement with, regulation of, or control over

emphasized the fact that the term "agency" is defined broadly under Florida's Public Records Act to include private entities "acting on behalf of any public agency." *Id.* (quoting Fla. Stat. § 119.011(2)). The court concluded that, after reviewing the totality of the factors, the firm was not acting on behalf of a public agency so as to fall under Chapter 119's definition of "agency." *Id.* at 1033.

¶ 175. Unlike Florida's public records laws, Wisconsin's public records laws do not extend to private entities acting "on behalf of a public agency." *Compare* Fla. Stat. § 119.011(2) *with* Wis. Stat. § 19.32(1). Therefore, it is difficult to swallow the majority's extension of the analysis in *News and Sun-Sentinel* to distinguish the case at hand. Majority op., ¶ 66 ("Moreover, unlike the architecture firm in *News and Sun-Sentinel,* 596 So. 2d 1029, BDADC received tax money in order to provide public service, not merely to receive compensation.").

¶ 176. The majority's analysis of the foreign precedents discussed above eschews discussion of the unique statutory language analyzed by courts in Maryland, New York, and Florida to determine whether these states' public records and open meetings laws applied to a particular entity. Instead of discussing the real statutory issues in these precedents, the majority instead draws broad conclusions regarding these cases

the private entity; (7) whether the private entity was created by the public agency; (8) whether the public agency has a substantial financial interest in the private entity; and (9) for [whose] benefit the private entity is functioning.

*News and Sun-Sentinel Co. v. Schwab, Twitty & Hanser Architectural Group, Inc.,* 596 So. 2d 1029, 1031 (Fla. 1992) (citations omitted).

to suit its result-oriented approach.[17] The majority's analysis of these foreign precedents is not a satisfactory technique for interpreting differently worded Wisconsin statutes.

3. Statutory History, Legislative History, Intent

¶ 177. The court of appeals' certification to this court indicated a problem with the methodology of the 1991 Attorney General opinion. It stated that the 1991 opinion "does not address the legislative intent behind the inclusion of 'quasi-governmental' corporations in the scope of the open meetings and public records laws." Unfortunately, this problem essentially persists in the majority opinion, even after the court of appeals' plea to this court that "any set of factors used to determine whether a corporation is 'quasi-governmental' should flow from a *developed discussion of legislative intent.*" (Emphasis added.)[18]

¶ 178. Because key terms in the statutes are not defined and are capable of being understood by reason-

---

[17] *See, e.g.,* majority op., ¶ 66 ("With respect to finances, BDADC is akin to the development corporation subject to open meetings and public records laws in *Carmel Realty,* and akin to the development corporation considered in *Buffalo News.*"); majority op., ¶ 74 ("In this respect BDADC is similar to the corporation in *Buffalo News,* which stated in its public brochures and financial statements that it was an agent of a city.").

[18] The Court of Appeals of Maryland recently addressed its duty under similar circumstances: "In some cases, the statutory text reveals ambiguity, and then the job of this Court is to resolve that ambiguity in light of the legislative intent, using all the resources and tools of statutory construction at our disposal." *City of Baltimore Dev. Corp. v. Carmel Realty Assocs.,* 910 A.2d 406, 418 (Md. 2006) (quoting *Chow v. State,* 903 A.2d 388, 395 (Md. 2006)).

159

ably well-informed persons in different senses, a court interpreting these terms needs to employ all the tools of statutory interpretation.

¶ 179. The analysis should begin with the text in the sections embodying the term "quasi-governmental corporation."

¶ 180. For example, Wis. Stat. § 19.32(1) reads:

> "Authority" means any of the following having custody of a record: a state or local office, elected official, agency, board, commission, committee, council, department or public body corporate and politic created by constitution, law, ordinance, rule or order; a governmental or quasi-governmental corporation except for the Bradley center sports and entertainment corporation; a local exposition district under subch. II of ch. 229; a family care district under s. 46.2895; any court of law; the assembly or senate; a nonprofit corporation which receives more than 50% of its funds from a county or a municipality, as defined in s. 59.001(3), and which provides services related to public health or safety to the county or municipality; a nonprofit corporation operating the Olympic ice training center under s. 42.11(3); or a formally constituted subunit of any of the foregoing.

¶ 181. There is a common characteristic to most of the entities listed in the definition of "Authority": they are indisputably government entities, including elected officials, or they are entities "created by constitution, law, ordinance, rule or order." *Id.* Local exposition districts are authorized by statute and created by a sponsoring municipality. Wis. Stat. § 229.42. Family care districts are authorized by statute and created by a county board. Wis. Stat. § 46.2895(1). By contrast, BDADC is not a local office or local agency or public body corporate and politic created by a government entity.

160

¶ 182. BDADC *is* a non-profit corporation. The legislature applied the public records law to "a nonprofit corporation which receives more than 50% of its funds from a county or a municipality . . . *and* which provides services related to public health or safety to the county or municipality." Wis. Stat. § 19.32(1) (emphasis added). BDADC is *not* covered by this language. The legislature went out of its way to reach another non-profit corporation: the non-profit corporation operating the Olympic ice training center. But BDADC is obviously not covered by that provision either.

¶ 183. There is a familiar canon of statutory construction that the enumeration or expression of certain things implies the exclusion of other things. *See C.A.K v. State,* 154 Wis. 2d 612, 621, 453 N.W.2d 897 (1990). While this canon is not infallible, it may be used "as a means of discovering legislative intent." *State ex rel. Sielen v. Cir. Ct. for Milwaukee County,* 176 Wis. 2d 101, 112, 499 N.W.2d 657 (1993). Implicit in the majority opinion is the principle that an entity's status as a non-profit corporation, even when the corporation is *not* created by government, does not exempt the corporation from public records law. The majority has failed to demonstrate that the legislature intended this result.

¶ 184. The only phrase left in the definition of "authority" is "a governmental or quasi-governmental corporation except for the Bradley center sports and entertainment corporation." Wis. Stat. § 19.32(1). Reference to the Bradley Center is significant. The Bradley Center corporation is "a public body corporate and politic." It is the subject of an entire chapter of the Wisconsin Statutes. *See* Wis. Stat. ch. 232. It was authorized by the legislature.

¶ 185. Admittedly, the Bradley Center corporation is a non-profit corporation, Wis. Stat. § 232.03(1),

but six of its nine board members are appointed by the governor, Wis. Stat. § 232.03(2)(a), implying a significant degree of state influence on the Bradley Center's statutorily defined mission.

¶ 186. The phrase "a governmental or quasi-governmental corporation" has legislative history. Wisconsin's current open meetings laws have their origin in the Anti-Secrecy Law of 1959. *See* ch. 289, Laws of 1959, creating Wis. Stat. § 14.90.

¶ 187. Wisconsin Stat. § 14.90 (1959) reads in part:

> *Open meetings of governmental bodies.* (1) In recognition of the fact that a representative government of the American type is dependent upon an informed electorate, it is declared to be the policy of the state that the public is entitled to the fullest and most complete information regarding the affairs of government as is compatible with the conduct of governmental affairs and the transaction of governmental business.
>
> (2) To implement and insure the public policy herein expressed, all meetings of all state and local governing and administrative bodies, boards, commissions, committees and agencies, *including municipal and quasi-municipal corporations,* unless otherwise expressly provided by law, shall be publicly held and open to all citizens at all times, except as hereinafter provided. No formal action of any kind shall be introduced, *deliberated upon* or adopted at any closed executive session or closed meeting of any such body. (Emphasis added.)

¶ 188. Wisconsin Stat. § 14.90 was amended and renumbered in 1969 to Wis. Stat. § 66.77. § 62, ch. 276, Laws of 1969. The "municipal or quasi-municipal corporation" language was continued in this new statute.

162

¶ 189. Consequently, we may be able to discern the meaning of "municipal corporation" and "quasi-municipal corporation" by examining the cases and statutes in place at the time the Anti-Secrecy Law was adopted, as well as contemporary interpretation.[19]

¶ 190. In *Iverson v. Union Free High School District*, 186 Wis. 342, 353, 202 N.W. 788 (1925), this court stated:

> [The Union Free High School District of the Towns of Springfield and Curran] is not a municipal corpora-tion. It is very grudgingly accorded the rank of a *quasi*-municipal corporation. 1 McQuillin, *Mun. Corp.* § 113. . . . It is but the agent of the state for the sole purpose of administering the state's system of public education and has only such powers as are conferred expressly or by necessary implication.

This ruling was affirmed in *Schaut v. Joint School District No. 6, Towns of Lena and Little River*, 191 Wis. 104, 107, 210 N.W. 270 (1926). These decisions show quasi-municipal corporations performing essential gov-ernmental functions.

¶ 191. More than 60 years later, the court of appeals described the Metropolitan Milwaukee Sewer-age District (MMSD) as a quasi-municipal corporation:

---

[19] On December 30, 1960, Attorney General John Reynolds issued a "Synopsis of Opinions Involving Anti-Secrecy Law," which focused on the activities of "public agencies" and con-cluded that meetings of the Regents of the University of Wisconsin, a city council, a joint sewerage district, a county bureau of personnel, and school boards and committees were required to be conducted in open session. John W. Reynolds, *Synopsis of Opinions Involving Anti-Secrecy Law,* Wisconsin Counties, Dec. 1961, at 12, 13, 22. The Attorney General repeatedly characterized those entities subject to open meetings laws as "public agencies." *Id.* at 12, 13.

> MMSD is a quasi-municipal corporation which provides sewerage treatment and disposal services to approximately twenty-eight Milwaukee area municipalities. MMSD is currently engaged in a fifteen-year water pollution abatement program designed to upgrade and rehabilitate the district's sewerage system. In an effort to recover the capital cost for the project, MMSD sought to levy property value-based capital charges against Mequon and the other municipalities which MMSD services outside Milwaukee county.

*State ex rel. Lank v. Rzentkowski,* 141 Wis. 2d 846, 849, 416 N.W.2d 635 (Ct. App. 1987). In 2000 the court of appeals observed in another decision that "[a]gencies, municipal corporations and quasi-municipal corporations are all creatures of the state and their powers are only those ascribed to them by the state." *Silver Lake Sanitary Dist. v. DNR,* 2000 WI App 19, ¶ 8, 232 Wis. 2d 217, 607 N.W.2d 50 (footnote omitted). All these decisions portray quasi-municipal corporations as essentially government entities.

¶ 192. The legislature revised and renumbered the open meetings laws in 1976. *See* ch. 426, Laws of 1975. This enactment saw "a municipal or quasi-municipal corporation" changed to "a governmental or quasi-governmental corporation." The majority has produced no legislative history showing an intent to seriously expand the scope of the law with the substituted language. This is why Attorney General La Follette said in 1977, the year after the law was passed, that "[e]ven though a corporation may serve some public purpose, it is not a 'governmental or quasi-governmental corporation' under sec. 19.82(1), Stats., unless it also is created directly by the Legislature or by some governmental body pursuant to specific statutory authorization or direction." 66 Wis. Op. Att'y Gen. 113, 115 (1977). This

is why he added in a 1985 opinion that "the term 'quasi-governmental corporation' is limited to nonstock body politic corporations created by the Legislature to perform essentially governmental functions." 74 Wis. Op. Att'y Gen. 38, 43 (1985). Inasmuch as the relevant portion of the law has not been changed since 1976, it is hard to fathom how a "quasi-governmental corporation" now includes a non-profit economic development corporation, not created by the government and completely without power to bind the government, that has a cooperation agreement to perform services for the government through a voluntary board and a single employee.[20]

¶ 193. There is authority for citizens to gain information about the work submitted to the City by BDADC without denominating this small non-profit corporation as a quasi-governmental corporation. *See* Wis. Stat. § 19.36(3).

¶ 194. A Special Committee on Applicability of Open Meetings Law to Quasi-Governmental Bodies (Special Committee) recently studied the issue before this court, and, although making no recommendation to the Wisconsin Legislature, the committee's proposed report indicated that a "bright-line test, such as requiring compliance with the Open Meetings Law for an economic development corporation that uses public funds for a specific percentage of its budget or that has

---

[20] The majority opinion discusses the modification of language in the open meetings statute in 1976. Majority op., ¶ 33. Then it states: "By changing the language, the legislature expanded the reach of the open meetings law. . . . [B]y changing the language of the open meetings statutes, the legislature expanded the law to apply to entities that are not per se public." *Id.*, ¶¶ 34, 36. The majority fails to provide a shred of legislative history to support this newly minted principle of law.

a specific number of public officials on its board," might be favorable. Wisconsin Legislative Council Proposed Report to the Legislature, PRL 2007–01, Feb. 22, 2007, at 5, *available at* http://www.legis.state.wi.us/lc/publications/prl/PRL2007–01.pdf (last visited June 27, 2008).[21]

¶ 195. The Special Committee reviewed several proposed amendments to Wis. Stat. §§ 19.32(1) and 19.82(1) that would have included or excluded an "economic development corporation" from or within the reach of Wisconsin's open meetings and public records laws. These proposals were based on bright-line criteria.

¶ 196. One Wisconsin Legislative Council proposal would have defined "economic development corporation" and *excluded* such an entity if *both* of the following were satisfied: "(a) The corporation receives less than 50% of its funds in cash or through inkind contributions, such as the use of governmental buildings, equipment, or staff, from the state or from a county, city, village, or town"; *and* "(b) Less than onehalf of the corporation's board and less than onehalf of the corporation's officers consist of public officials or public employees." Special Committee on Applicability of Open Meetings Law to Quasi-Governmental Bodies, WLC

---

[21] A December 12, 2006, letter from then Attorney General Peggy Lautenschlager to State Senator Scott Fitzgerald also indicated that "[a]dopting a bright line test based on source of funding would serve the public well. It gives the entity notice of when it must comply with the open meetings and public records laws." Letter from Peggy Lautenschlager, Wisconsin Attorney General, to Scott Fitzgerald, Wisconsin State Senator (Dec. 12, 2006) *available at* http://www.legis.state.wi.us/lc/committees/study/2006/QGOV/files/lautenschlagerltr.pdf (last visited June 27, 2008).

0047/01, 4 *available at* http://www.legis.state.wi.us/lc/
committees/study/2006/QGOV/files/0047_1.pdf (last
visited June 27, 2008).

¶ 197. Another proposal would have defined "eco-
nomic development corporation" and *included* such an
entity in the definition of "governmental body" in Wis.
Stat. §§ 19.32(1) and 19.82(1) if *either* of the following
criteria were satisfied: "(a) The corporation receives at
least 50% of its funds in cash or through inkind
contributions, such as the use of governmental build-
ings, equipment, or staff, from the state or from a
county, city, village, or town"; *or* "(b) At least onehalf of
the corporation's board or at least onehalf of the
corporation's officers consists of public officials or pub-
lic employees." Special Committee on Applicability
of Open Meetings Law to Quasi-Governmental Bodies,
WLC 0048/01, 2 *available at* http://www.legis.state.
wi.us/lc/committees/study/2006/QGOV/files/0048_1.pdf
(last visited June 27, 2008).

¶ 198. The fact that the Special Committee sig-
naled that bright-line criteria are needed to determine
the treatment of economic development corporations
for purposes of Wisconsin open meetings and public
records laws is evidence that the present statutes do not
dictate the result announced by the majority.

¶ 199. The majority has failed to convincingly
utilize statutory history, legislative history, or other
evidence of the intent behind use of the phrase "quasi-
governmental corporation" in Wis. Stat. §§ 19.32(1) and
19.82(1). The majority has left the public with a "test"
that provides no definitive guidance.

4. Application

¶ 200. The majority's application of the "test" it
creates is deficient for two reasons: (1) The majority

relies on certain facts that occurred *after* the State filed its amended complaint in December 2004 when those facts strengthen the State's case, but it disregards facts that changed after December 2004 if those facts weaken the State's case; and (2) BDADC is not a "quasi-governmental corporation," even based on the "totality of circumstances" test of the 1991 Attorney General opinion.

¶ 201. First, the relevant adjudicative facts regarding the nature of BDADC are those in existence at and before the time the State's amended complaint was filed on December 20, 2004. To consider facts regarding BDADC that occurred after this date is to analyze a different entity from the one the State's amended complaint asserts violated open meetings and public records laws.

¶ 202. The majority does not recognize this distinction and instead relies on the following irrelevant facts in evaluating BDADC: (1) "*In the first half of 2005,* for example, the room tax contribution accounted for about 84 percent of BDADC's income." Majority op., ¶ 21 (emphasis added); (2) BDADC's "*2005 plan* allows that BDADC may negotiate financial incentives for businesses and work on dealing with infrastructure and government approval issues related to attracting business to the area." Majority op., ¶ 22 (emphasis added); and (3) "*In 2004 and 2005,* BDADC negotiated on the City's behalf regarding potential developments by a variety of businesses." Majority op., ¶ 24 (emphasis added). None of these facts has bearing on whether BDADC, as it existed when the State's amended complaint was filed, constituted a "quasi-governmental corporation."

168

¶ 203. At the same time, even though this ruling has been made prospective, the fact that BDADC no longer has an office in a Beaver Dam municipal building is given no significance.

¶ 204. Second, if this court were properly to apply a fact-based test like the one used in the 1991 Attorney General opinion, BDADC would not constitute a "quasi-governmental corporation."

¶ 205. In 80 Wis. Op. Att'y Gen. 129 (1991), the Attorney General analyzed whether the Milwaukee Economic Development Corporation (MEDC) and Metropolitan Milwaukee Enterprise Corporation (MMEC) were quasi-governmental corporations under Wis. Stat. § 19.82(1) subject to open meetings laws. The Attorney General concluded that both of these entities were quasi-governmental corporations under the statute under facts distinct from those in this case. 80 Wis. Op. Att'y Gen. at 136.

¶ 206. With regard to MEDC, the Attorney General relied upon the following facts to reach his conclusion: all MEDC offices were located in city-owned buildings; under MEDC's contract with the City of Milwaukee, the Commissioner of the Department of City Development selected the president, vice president, secretary, and treasurer of MEDC; all MEDC's officers were city employees and some of MEDC's staff were city employees; the city provided MEDC with all its office space, equipment, and supplies (although MEDC was required to reimburse the city, and that obligation was offset against grants MEDC received from the city); and four of MEDC's nine directors were City of Milwaukee officials. *Id.* at 130–31.

¶ 207. With regard to MMEC, the Attorney General relied upon the following facts to reach his conclusion: the corporation provided economic development

loans with funds the city obtained under the federal Small Business Administration program; two of MMEC's directors were city council members and one was a city employee; the principal office of MMEC was the Department of City Development; all MMEC offices were located in city-owned buildings; the city selected the officers for MMEC, and a city official selected all of MMEC's current officers; all MMEC officers and some of its staff members were city employees; the city provided all office space, equipment, and supplies needed by MMEC; and the cost the city incurred in supplying staff and other resources to MMEC was offset against grants MMEC received from the city. *Id.* at 131–32.

¶ 208. The Attorney General concluded as follows with regard to MEDC and MMEC:

> The fact that MEDC and MMEC serve a public purpose by promoting economic development in the City of Milwaukee is not, in itself, sufficient to make the corporations "quasi-governmental." . . . Nor is the fact that MEDC and MMEC receive most of their funding from public sources. . . . However, in addition to these facts, four of MEDC's nine directors are city officials. They serve as directors by virtue of their positions as city officials, not as private citizens. The city selected the president, vice president, secretary and treasurer of MEDC and MMEC. All of those officers are city employe[e]s. The day-to-day operations of both corporations are, therefore, subject to the control of city employe[e]s. Further, the Department of City Development is the principal place of business for both MEDC and MMEC. Both corporations enjoy the privilege of being housed in city-owned buildings, using city equipment and supplies and having corporate officers and staff included on the city payroll and in the city employe[e] benefit plan. In light of all these facts, I conclude that MEDC and MMEC resemble a governmental corporation in pur-

170

> pose, effect or status closely enough to constitute a "quasi-governmental corporation" within the meaning of section 19.82(1).

80 Wis. Op. Att'y Gen. at 136 (citation omitted).

¶ 209. Like MEDC and MMEC, BDADC receives most of its funding from a public source—in this case the city of Beaver Dam's room tax and interest on allocations of that tax. However, this is only one factor to consider in weighing the totality of all facts and circumstances.

¶ 210. BDADC is controlled by its Board of Directors, which consists of 12 voting members. Only two of these members are public officials of the City, unlike four of the nine board members of MEDC and MMEC. *Id.* BDADC's Board elects BDADC's officers, manages and controls the assets of BDADC, and formulates all corporate policies and programs. The Board, not the city of Beaver Dam, elects replacement members. Furthermore, Board meetings have never taken place at any City facility.

¶ 211. BDADC has a single compensated, full-time employee, its Executive Vice President, who is hired, supervised, and paid solely by the Board, not the City. The Executive Vice President of BDADC is not a City employee, unlike the officers of MEDC and MMEC, all of whom were City of Milwaukee employees selected by the City of Milwaukee. *Id.* at 136–37. The activities of BDADC's Executive Vice President were carried out with little or no use of City resources. Trent Campbell did virtually all his own work, had his own computer, was not on a network with the City, and never consulted the City's attorney for legal advice. Campbell enjoyed no governmental immunity under Wis. Stat. § 893.80(4). The City does not represent BDADC in this lawsuit.

171

¶ 212. BDADC's 1997 and 2004 cooperation agreements included provisions requiring BDADC to indemnify the city of Beaver Dam and hold it harmless for "any claims, demands, actions, causes of action, proceedings, actions and liabilities, together with all costs, expenses and disbursements (including reasonable attorneys fees and costs) incurred by the City as a result of the [BDADC]'s acts or omissions." The fact that BDADC is obligated to indemnify the City for any wrongs committed in the course of their relationship suggests that BDADC and the City are independent entities that make independent decisions.

¶ 213. Most important, BDADC has no authority to bind the city of Beaver Dam in contract or to create obligations on the City's behalf. No municipal action can be taken by BDADC, and any agreements it negotiates with other corporations and entities are subject to the normal legislative process (including open meetings and public records laws) before being officially approved and adopted by the City as policy.

¶ 214. The majority errs in concluding that BDADC is a quasi-governmental corporation. BDADC does not constitute a quasi-governmental corporation, i.e., an entity that "resembles a governmental corporation," majority op., ¶ 99, under the totality of all facts and circumstances.

## III. CONCLUSION

¶ 215. The majority has chosen to impose new and significant burdens on some private non-profit economic development corporations in Wisconsin while simultaneously leaving the reach of its holding a mystery. In doing so, it has failed to provide guidance to the public regarding the definition of "quasi-governmental

corporation" in Wis. Stat. §§ 19.32(1) and 19.82(1) and to reach a satisfactory conclusion regarding the application of that language to BDADC. Accordingly, I must respectfully dissent.

¶ 216. I am authorized to state that Justice PATIENCE DRAKE ROGGENSACK joins this dissent.